THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HECTOR ESCOBAR, Defendant-Appellant.

First District (3rd Division)   No. 78-569

Opinion filed September 26, 1979.

Ralph Ruebner, of State Appellate Defender's Office, of Chicago (Alan D. Goldberg, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Nicholas Iavarone, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

The State maintains that Hector Escobar drove a car which carried a gunman who fired upon and killed Bryan Wagner. Escobar denies being the driver. The State's single occurrence witness recognized the driver as an old high school acquaintance whom he knew only as "New York."

Escobar also denied being that acquaintance. He was tried before a jury, convicted of murder, and sentenced to 14 to 30 years in prison. He appeals.

Before trial, the court denied motions to quash arrest, to suppress statements, and to suppress identification.

The State's only occurrence witness, Joseph Bradtke, was 18 years old when he testified, 17 at the time of the murder. He had known Bryan Wagner "for many, many years," and was a good friend of Bryan. Bradtke had attended Lakeview High School, but had left school several years earlier.

The resolution of this appeal requires that Bradtke's testimony be set forth at some length. At 12:30 a.m. on August 19, 1976, Bradtke and six friends, including Bryan, were drinking beer on or near his front porch at 1623 West Byron Street in Chicago. Bryan and Ronnie Yukawa were riding bicycles in front of the porch near the curb.

A blue Chevrolet automobile turned onto Byron Street, almost hitting Bryan. The witness, who did not observe anyone else in the car, yelled out "slow down" to the driver. The driver responded by gesturing with his middle finger and yelling something in Spanish.

Meanwhile, Ronnie Yukawa, who had ridden to the corner on his bicycle, was heading back to his companions. The car pulled alongside and the driver asked Ronnie, "What did you say?" Ronnie replied, "I didn't say anything." The witness approached the car and told the driver that he, not Ronnie, had said, "Slow down." The driver began cursing and Ronnie punched him in the face. The witness said, "Why don't you just be cool and leave this neighborhood. Don't start no trouble here." The driver told the witness he was crazy and began cursing again, and Ronnie punched him again. The witness then told the driver, "Please, just leave before any more trouble starts," to which the driver replied, "Yes, I'm leaving, but I'll be back."

When later cross-examined about this portion of the evening, Bradtke admitted, after being shown a copy of his statement to the police, that he had not told the police he and the other boys had been drinking that night. Bradtke also admitted that during two interviews with the police on August 19, he had not told them that Ronnie hit the driver with a belt wrapped around his fist. He did not tell them of any physical acts against the driver. Bradtke explained that he had not forgotten, but had "decided to cover for my friends." Not until 3 days later, when Ronnie told Bradtke "not to cover for him" but to tell the police the whole truth, did Bradtke reveal these facts to the police.

Having run out of beer, Bradtke and his companions headed down Marshfield north toward Irving Park Road to buy some more. Ronnie and Bryan rode their bikes while the rest walked. Bradtke testified that during

this walk, he observed a car coming about 35 m.p.h. southbound on Marshfield; the car, either a Vega or a Pinto, then slowed to about 3 m.p.h. Bradtke was "face to face" with the driver. At that point, the witness saw a man who had been hiding in the back seat raise his head. The driver appeared to have a conversation with his passenger, as the witness and his friends continued on their way, some of them throwing bricks after the car.

On cross-examination about this episode, Bradtke testified that, during his contacts with the police on August 19, he did not tell the police that there were bricks and stones thrown at the car, because he wanted to "cover for" somebody. Although he had told the police that it was about 20 minutes between the blue Chevy driving away and the second car appearing, on cross-examination he was only able to set the time interval as somewhere between 20 minutes and an hour and a half. He further testified that the four other boys (excluding Bryan and Yukawa) were standing around him, within 4 or 5 feet from one another as the car passed; he also said that it was dark.

As they approached Irving Park Road, Bryan, who was still riding his bike, said, "There is that car again." The car, now on Irving Park eastbound, slowed as it approached the corner of Marshfield. Bryan, who was ahead of those on foot, made a U-turn with his bike and came toward the witness and the others. As the passenger side of the car came alongside where the witness and his friends were standing, the car stopped, and a person in the rear right seat fired a gun. Bryan, who was about 5 feet from Bradtke, began pedalling away from the car. The witness heard six shots.

When Bradtke realized that he was being fired at, he took cover near a wall. Then, as the car began to pull away, he saw Bryan fall over the handlebars of his bike, get back up, and walk over to him. The witness, observing blood over Bryan's lips and nose, asked if he was all right. Bryan replied, "I don't know," and then, "Let's get 'em, Joe." As Bryan spoke those words, he vomited blood and fell into a nearby store doorway.

On cross-examination, Bradtke testified that, before the gunman began to fire, he was able to see the entire side of the car. It was a two-door, and the rear right side window was rolled down, with an inch of glass showing in the window frame. He saw only the first two letters on the license plate, and these letters were "NY." He told the police that the car was either a Vega or Pinto. The police report he signed described the car as a red Vega. Several of the other boys were standing around Bradtke when the shooting began.

Bradtke made an in-court identification of the defendant as the driver of the second car. He testified that he had first met the defendant 2 or 3

years before the shooting, when Bradtke was attending Lakeview High School. He had also seen him occasionally since then. At school he knew the defendant only by the name of "New York." On the night of the shooting, he described the driver to police as 19 to 20 years old with a little goatee and very curly hair which was frequently slicked down. He added that the driver was about 6 feet tall, and always wearing high-heeled shoes. Bradtke further testified that, on the night of the shooting, he would have been unable to determine the driver's height, and that the description he had given the police did not reflect the driver's appearance, but the appearance of the man whom he had known in high school.

Bradtke also testified that on August 19, 1976, he was taken to the police station, where he looked through high school yearbooks and chose a picture of the defendant, Escobar. Later that day, he and three of his companions at the murder scene viewed a lineup. Bradtke identified the man he had known as "New York." After the lineup he was told that the man he had identified was Hector Escobar. After this lineup, the police left the viewing room unattended, at which time, Bradtke testified, the defendant told him that "I was going to be dead before Bryan was buried."

At this point, the defense moved for a mistrial, based on the State's failure to comply with a discovery motion requesting the contents of all statements made by the defendant and a list of witnesses to the making of the statements. The defense maintained that Bradtke's testimony about Escobar's threats fell within the scope of the discovery request, yet no information about the statement had been given to the defense. This motion was denied.

Bradtke testified that when his friends told him they had not identified anyone in the lineup, he "might have been" pretty upset. When he contacted police to determine what had happened, he learned that Escobar had been released. Bradtke, however, was convinced that Hector Escobar had driven the car, and he wanted the guilty person "to pay for it."

On August 23, 1976, Bradtke returned to the police station. He gave the police one of several shell casings that he said were used to shoot Bryan Wagner. On redirect examination, Bradtke was asked if he knew or had heard where the shell casings came from. The defendant's hearsay objection was overruled, and Bradtke testified that he was told they were found in the back seat of New York's car. He had the casings for a day or two before turning one of them over to the police; he did not give the casings to the police when he received them on August 21 because he might have wanted to settle the matter himself.

Also on redirect examination, Bradtke agreed that "everybody" knew the defendant as New York. The trial judge termed the question

"preliminary" and overruled a defense objection. The witness was then asked whether Bryan Wagner knew the defendant as New York. After he answered yes, another defense objection was made, but this one was sustained; the court, though, did not rule on a motion to strike.

Following Bradtke's testimony, the defense moved for a mistrial, citing the State's failure to comply with a defense discovery motion requesting photographs shown to any witness making an identification. The State had never informed the defense of Bradtke's use of the yearbooks, and the defense had no prior opportunity to examine them. Counsel also renewed the motion to suppress identification, on the same grounds. These motions were denied. The yearbooks were given to the defense later in the trial.

Investigator Nicholas Schuler testified that on August 30, as a result of a phone call from a suspect in the shooting, he proceeded to 2018 West Giddings, where he observed a car double-parked, its motor running and its back seat loaded with clothes. With other officers, the witness entered the building and proceeded to the attic apartment. People could be heard moving about the apartment, but no one responded to the officer's knocks. After a third knock, someone asked who was there; the police announced their office, and the door opened. Schuler asked the man who opened the door where New York was. The man pointed to the back door. A defense objection on hearsay grounds to this question and answer was overruled. Schuler then said that he found Escobar crouched in a storage area near the back door.

Edward Adorjan, a Chicago police officer, the first witness for the defense, testified that on August 19, he conducted a lineup in which the defendant was one of the subjects. The officer stated that the lineup is conducted through a one-way mirror; both rooms emptied into the main squad room. The witness stayed behind the one-way mirror with the subjects of the lineup until the identification process was complete, then left the room. At this time, the people who had viewed the lineup were not in the area. It was never reported to Adorjan that Escobar had any contact with anyone who viewed the lineup.

Ross Vetrano, another Chicago police officer, testified to the description of the driver that Joseph Bradtke gave him at the murder scene; a male Puerto Rican named New York with whom he had attended Lakeview High School. Bradtke was the only person at the scene who said he knew the driver. There was some disagreement between those who witnessed the murder about the make of the car, but it was said to be either a Vega or Pinto. There was also disagreement about whether the license number was MY 6901 or NY 6901. There was no further evidence regarding the car except for the testimony of John Sims.

Sims, general manager of Division Chevrolet Co., testified as to the

various body styles of Vegas; in particular, he stated that the rear windows on those cars do not roll down but rather pop out. Pinto rear windows also pop out.

Officer William Savage gave testimony similar to that of Officer Vetrano.

It was stipulated that, according to expert tests, the shell casing Bradtke gave the police was fired from a rifle that one George Lund, not elsewhere mentioned in the record, voluntarily surrendered to the police, and that a pellet recovered from the wall of a building where Bryan was shot was not fired from the rifle.

During the State's closing argument, the prosecutor argued that Hector Escobar was also known as New York. To support his point, the prosecutor asked Escobar to place his hands on the table. The defense objected; the objection was overruled. The prosecutor asked the defendant a second time. Another objection was overruled. The prosecution then asked the court to instruct the defendant to place his hands on the table; but the court replied, "If he doesn't want to, he doesn't want to." Thereupon, the prosecutor said, "Now Ladies and Gentlemen, from my vantage point tattoo on his right hand is N.Y., New York." The defense then moved for a mistrial. The motion was denied.

The prosecutor's rebuttal argument began with the following statement (objections omitted):

> "From the day this trial began I suggest to you that the Defense in this case was a sham and a fraud * * *. I suggest to you that Counsel * * * has misled you as to the facts and as to the law. * * * I am not saying he isn't entitled to adequate defense, et cetera. But in defense of Hector Escobar he has misled you as to what the issues are in this case. Why is he so damn afraid to get to the issue?"

Later in the argument, he told the jury: "Misled, that's what you were," and "He [defense counsel] was trying to trick him [the witness] * * *. That's a fraud."

The prosecutor also repeatedly referred to the State's case as "uncontradicted and undenied," using this phrase six times; and he followed up by asserting that "there was no defense in this case. No real defense."

■▋ The defendant first asserts that he was not proven guilty beyond a reasonable doubt. But it is well established that a positive identification by one witness with ample opportunity to observe is enough. (*People v. Clarke* (1971), 50 Ill. 2d 104, 110, 277 N.E.2d 866.) Bradtke's testimony, if believed, proves the defendant guilty. Although his testimony was impeached on other issues, its thrust was not destroyed. If Bradtke was acquainted with the person he claimed to know as New York, his

recognition of that person was entirely plausible. His identification of the defendant as New York is supported by the description of the arrest scene, the threat at the lineup, and perhaps the letters on the license plate. He had no clear motive for wanting Escobar convicted. Thus, the State's evidence, while to some extent questionable, was not so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt regarding the defendant's guilt. (*People v. Smith* (1978), 67 Ill. App. 3d 672, 385 N.E.2d 44.) The jury, observing Bradtke, could reasonably have believed the crucial parts of his testimony, and convicted the defendant; our judgment should not be substituted for theirs.

■■ However, the State's case was marginal, because only one out of five occurrence witnesses identified the defendant and Bradtke was impeached on several matters. Therefore, any impropriety may well have swayed the verdict, and error cannot easily be dismissed as harmless. As the conviction is tainted by several errors, whose effect, at least cumulatively, seems substantial, we reverse and remand.

The defendant points out two incidents of improper admission of hearsay evidence. The first concerns Bradtke's testimony on redirect examination that everybody knew the defendant as New York. His first testimony along these lines came on cross-examination by defense counsel. The witness volunteered that "everybody" in the group at the murder scene knew New York; he elaborated with the following statement: "When the car went on Marshfield and Bryan, he pointed out and somebody else had stated 'That's New York.' " Defense counsel did not move to strike this response. The defendant complains, rather, of the redirect examination, when the witness stated he had already testified that everybody knew the defendant as New York, and that Bryan knew him as New York.

■■ Bradtke's testimony that "everybody" knew the defendant as New York, presumably meaning that his friends had been able to identify the suspect Escobar as "New York," if not as the driver, is hearsay. Also, it is obvious that any identification of the driver attributed to Bryan, who was dead, is hearsay. Bradtke's testimony was damaging to the defendant, for the main issue in the case was identity, and any identification of the defendant as New York or of the driver as New York substantially advanced the State's cause. True, the jury had before it evidence that nobody except Bradtke had picked the defendant Escobar out of a lineup or otherwise identified the driver to the police; the jury also knew that no one else who was at the murder scene testified in court. Bradtke's testimony that "everybody" knew might therefore seem evidence less of the truth of that fact than of Bradtke's untrustworthiness. But the jury might instead have believed Bradtke and assumed the other witnesses to the crime kept silent out of fear, as the prosecution hinted. We should not

speculate about how the jury reacted; we must assume the statement was prejudicial.

■■ The second hearsay dispute concerns Bradtke's testimony that he gave a shell to the police because he had been told it was found with other shells in the back seat of New York's car. For the purpose of showing that the shells did come from the car, this is inadmissible hearsay. The State protests that the evidence was introduced, not as hearsay, but to explain why Bradtke brought the shell to the police. However, the danger that the jury would misuse the evidence is so much greater than the value of detailing why Bradtke thought the shells were important that the evidence should have been excluded. (*People v. Johnson* (1979), 68 Ill. App. 3d 836, 386 N.E.2d 642.) True, the physical evidence tended to show that the shell Bradtke gave the police was not the murder shell; but the inference that people fired guns from the back seat of the defendant's car is prejudicial enough.

If there was any doubt about the likely hearsay use of this testimony, it disappeared when the prosecutor in closing argument declared that the only thing we know about the shells is that they came from the defendant's car. This both recalled the forbidden use of this testimony and revealed that the State thought the testimony was useful to its case. The combination of the introduction of the evidence itself and the argument about it requires reversal.

This brings us to the State's closing argument; Escobar advances two valid complaints. First, there is the tattoo incident. The defendant raises two arguments against the prosecutor's avowal that the defendant had a tattoo "NY": that it was unsworn testimony, and that it came at the wrong time. The first point does not impress us, the second does.

The prosecutor's observation, though technically unsworn testimony, has none of the weaknesses that normally infect such evidence. A description of a permanent visible characteristic of the defendant could hardly be false, for the defendant could instantly prove any mistake. Indeed, the record of the pretrial hearing establishes that Escobar's hand bore a small tattoo, "NY," though this fact was inexplicably not given in evidence to the jury. The State could have introduced it properly; the maneuver used was more dramatic, but hardly less reliable. Thus, the unsworn status of the evidence was harmless, if not actually proper.

■■ The prosecutor's statement, however, came in closing argument. No new evidence may be introduced during arguments, when it is too late for the other side to present evidence to counter or explain it. By saving the matter for his rebuttal argument, the prosecutor even precluded defense counsel from arguing in response. This was reversible error.

■■ One more ground for reversal is another thread of the State's closing argument. The prosecutor described the State's case as "uncontradicted

and undenied," using this phrase six times. The defendant contends that this impermissibly drew attention to the defendant's not testifying. The State must not make arguments intended or calculated to draw the jury's atttention to the defendant's failure to testify. (*People v. Burton* (1969), 44 Ill. 2d 53, 254 N.E.2d 527; *Watt v. People* (1888), 126 Ill. 9, 18 N.E. 340.) It may argue that its case is uncontradicted, even if the only one who could contradict it is the defendant. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.) Repetition is not necessarily fatal. (*People v. Hopkins* (1972), 52 Ill. 2d 1, 284 N.E.2d 283 ("uncontradicted" used seven times).) But an argument whose thrust is the defendant's nonappearance rather than the strength of the State's case is error.

■■ Here the defense put on four witnesses, and strenuously attacked the State's evidence. Where the State's case is not in fact unchallenged, the suggestion that it is becomes suspect; it is not "an accurate summary of the evidence" (*Hopkins*, 52 Ill. 2d 1, 6). The only reasonable point to the comment is the defendant's silence. The State suggests that many people other than the defendant could have contradicted its evidence, and that it was to them the prosecutor referred; but, in fact, it was the State that was defensive about the shortage of witnesses. Moreover, while "uncontradicted" is a colorless word, and could apply to almost anyone, "undenied," though not *per se* impermissible (*People v. McTush* (1978), 61 Ill. App. 3d 214, 377 N.E.2d 1148) points more at the defendant: anyone can contradict anything, but one denies an accusation. The repetition shows that this was not just a careless choice of words, but deliberate, and assured that the jury would not miss the nuance. The prosecutor also remarked, "There was no defense in this case. No real defense." Again, since there was, in fact, a substantial defense, the comment hints that the only "real" defense would be for the defendant to testify. Having read the prosecutor's rebuttal argument in its entirety, we conclude that the remarks in their fair and natural meaning did improperly focus attention on the defendant's silence.

■■ The other errors relied on by the defendant either will not recur at a new trial or are not grounds for reversal. The State failed to disclose to the defense the threat Bradtke testified the defendant made to him when the lineup ended. The defendant now has complete information regarding the incident. The State also failed to disclose to the defendant the high school yearbooks which Bradtke used to identify New York as the defendant Escobar. Not disclosing these on request was error, but the harm is debatable. They were not being used to identify a suspect, but only to discover his name. Since the defendant will have the books at his new trial, it is unnecessary to decide whether the State's failure was reversible error.

■■ Another of the defendant's claims of error is Officer Schuler's

testimony that the man who opened the door of the apartment where Escobar was arrested pointed to the back when asked where New York was. The defendant argues that this was hearsay and inadmissible. The man's response, the equivalent of a verbal "He's back there," arguably signified not just that some person was there, but that the person who was there was known as New York. It tacitly acknowledged the nickname as the defendant's. This, however, does not necessarily make the man's gesture hearsay. A name is inherently a matter of repute, created and established by people's knowledge and use. An obvious way of proving a name is to show how others refer to the person whose name is in question. By pointing to the door, the man was demonstrating, not asserting, that the man behind it was New York. We do not believe this was hearsay; and hearsay or not, the man's unreflective gesture was no doubt as reliable as his testimony in court would be. In fact, a witness testifying in court as to a nickname could only state a conclusion from observations no less hearsay than what is offered here. For these reasons, Officer Schuler's testimony should be admitted at the new trial.

For the foregoing reasons, the conviction is reversed, and the case remanded for a new trial.

Reversed and remanded.

McGILLICUDDY and RIZZI, JJ., concur.