THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HECTOR GARZA, Defendant-Appellant.

First District (2nd Division)   No. 1—87—3014

Opinion filed February 21, 1989.—Rehearing denied April 5, 1989.

James R. Epstein, of Epstein, Zaideman & Esrig, P.C., of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Jeanne A. Morrow, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant appeals his conviction of murder and sentence of 35 years' imprisonment, raising the following issues: (1) whether he was denied his right to the effective assistance of counsel; (2) whether he was proved guilty beyond a reasonable doubt; (3) whether the trial court allowed inadmissible hearsay testimony into evidence; and (4) whether he was denied a fair trial by the State's attempt to present evidence of motive and its comment on his failure to call an alibi witness.

Police officer Dubielak, the first witness called by the State at trial, testified that during the early morning hours of April 27, 1986, he received a call regarding a man shot at 2811 North Hamlin in Chicago. When he arrived at that location, he saw a girl immediately outside the door of an automobile cradling in her lap a young man who had been shot. Dubielak attempted to get a description of the offender from the girl, who was hysterical. On cross-examination, he repeated the description of the offender given to him at the scene by the girl: a male approximately 17 or 18 years of age, 5 feet 7 inches, 140 to 150 pounds, blue eyes, dark brown hair and a scar over his left brow, wearing a navy blue hooded sweatshirt, grey baggy pants, and black rocker shoes.

Donna Mikolajewski testified that she and the victim, Kenny Nuckols, had spent the evening together and were sitting in a car at the corner of Diversey and Hamlin at 3:30 a.m. when a man, later identified as defendant, approached them. Defendant said he was from Washtenaw and Glenlake and that he was a member of the Popes street gang. Donna testified that she was looking directly at him during this entire time. He repeatedly asked Nuckols what gang he belonged to, and finally Nuckols told him that he was a member of the Simon City Royals. At that point defendant walked back two or three feet, pulled out a short silver-barreled gun and fired five or six shots, the first of which missed both Donna and Nuckols; but the second one hit Nuckols, who threw himself onto Donna, while shouting to her to get down. After Nuckols was hit two more times, Donna got out of the car and ran as the assailant fired at her. She attempted to

get help, but no one responded to her calls. When she heard defendant run down a gangway, she returned to the street, where she found Nuckols. The police took him to a hospital where he was pronounced dead.

That same morning the police took Donna to a station and showed her approximately 20 mug books. She picked out some pictures, but after viewing a lineup did not identify anyone.

On May 4, 1986, at 7 p.m., Donna was once again at the corner of Hamlin and Diversey when two men riding on a motorcycle shot at her. She informed the police that the person who shot at her "was very similar" to the person who killed Nuckols, and she gave the police the same description she later gave at trial in describing Nuckols' killer. On May 5, 1986, she viewed a lineup but did not see her attacker. On May 7, 1986, Donna viewed photographs and from them tentatively identified defendant as the person who had killed Nuckols and shot at her; but she positively identified him when she saw him in a lineup.

Deputy Medical Examiner Mitra Kalelkar testified that Nuckols' wounds indicated that he had been shot at close range, and that the trajectory of the wounds was consistent with his having been shot from the left side.

Daniel Noon, a gang crimes specialist with the Chicago police department, testified that during his investigation of the May 4 shooting he spoke with various members of the Gaylord gang, and on May 6, 1986, defendant, a Gaylord, surrendered himself for that incident. He told the police that, after being hit by a bottle thrown by a group of Royals, he lighted some firecrackers from the motorcycle and waved a toy gun to make it appear as if he were shooting.

Defendant testified that he is 5 feet 8 inches and 160 pounds, with dark brown hair, brown eyes and no scars on his face; that on April 26, 1986, he attended a party until approximately 1:30 a.m., when he walked home; that he had forgotten his keys, so he had to knock on his sister's window to gain entry to the house; that he went directly to his room and to sleep; that he was nowhere near the intersection of Diversey and Hamlin; and that on May 6, 1986, he voluntarily surrendered himself to the police for the motorcycle incident, even though he was not responsible for it, because he had been directed to do so by another gang member.

On cross-examination the State established that gang members do pay back rival gang members for perceived wrongs, that such pay backs can include hurting rival gang members, and that the Royals and the Gaylords are rival gangs. Defendant admitted that he was a

member of the Gaylords and that the colors of the clothing he was wearing in court were Gaylord colors.

Out of the hearing of the jury, the defense stated to the trial judge that it wished to call Andrea Zeman but that the State was going to object because, as defense counsel claimed, she would testify that Donna had told her that she and Nuckols were shot from a car as they walked down the street. The State did object, but on the ground that the testimony to be offered was hearsay and that the defense had failed to lay a foundation to bring in the witness. The trial court agreed and the defense then rested.

The State presented Detective Bogucki and Officer Noon as rebuttal witnesses. Noon testified that, after Donna identified defendant in the May 7 lineup, defendant made a statement regarding the murder in which he at no time mentioned that when he arrived home early on April 27 he had to wake his sister in order to get into his home; instead, defendant had simply said that he had walked home from the party, it was late and he had gone to bed.

Detective Bogucki testified that during his investigation of Nuckols' murder he read reports which had previously been prepared by the officers at the scene of the crime and that he had noticed discrepancies in them concerning the description of the assailant. He spoke with Donna and asked her what description she had given, and she replied that she had described a white male, approximately 17, 140 to 150 pounds, dark eyes, long lashes and a medium complexion, wearing a dark hooded sweatshirt with a zipper, grey baggy pants and black rocker-type shoes. When asked about a description of blue eyes and a scar over the eyes, she stated that she had been describing the victim. Bogucki documented this in a supplemental report.

The jury found defendant guilty of murder. Defendant had retained new counsel when he presented his motion for a new trial. At the hearing on this motion, Officer Raymond Schalk testified that after a conversation with Donna on the day of the murder he made notes containing the words "possible scar on arm above a tattoo." He stated that this was written after Donna told him that defendant had told Nuckols he was a Pope and that he had scars and tattoos to prove it, but that she had not seen them. It was stipulated that if Officer Noon were called to testify, he would state that Donna chose two pictures out of a mug book, one of Sean Ronan and one of Daniel Ulbert, and said they "looked similar" to Nuckols' attacker. She later viewed a more recent photo of Ronan and decided that he was not the offender; she then viewed Ulbert in a lineup but did not identify him. Photos of these men were admitted into evidence for purposes of the

post-trial motion. The trial court found no reason to set aside the jury's verdict and denied defendant's motion for a new trial. Defendant now appeals his conviction.

OPINION

Defendant argues that he was denied his right to the effective assistance of counsel at his trial, claiming that his attorney was incompetent in not attempting to have the photographs of Ronan and Ulbert admitted into evidence at trial; in failing to question Donna about the inconsistent descriptions she gave and in not getting before the jury the fact that she had previously told investigators that the assassin had a scar and tattoo; in failing to get Andrea Zeman's testimony into evidence; in not calling defendant's sister to corroborate his alibi defense; and in not calling either Chuck Groves or Tony Mroczka, who would have testified that defendant was not responsible for the motorcycle incident and that he turned himself in only to cover for another gang member. Defendant contends that there was no possible strategic reason not to present such evidence.

The State contends that any discrepancies in Donna's description of the murderer were cleared up at trial where they were shown to be the result of error when the police were transcribing the description. It claims that defendant has not shown that he was prejudiced by the jury's not reviewing the photos of Ronan and Ulbert because, contrary to defendant's argument, the jury may have noticed the similarities rather than the differences in their appearance and that of defendant; accordingly, defendant could only be speculating that he would have benefitted from a jury's viewing of these photos. The State also maintains that trial counsel may have decided it was not in his client's best interest for Zeman, defendant's sister, Groves or Mroczka to testify.

■■ The "benchmark" for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984), 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.)

> "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of [this] particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just

results." *Strickland,* 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

See also *United States v. Cronic* (1984), 466 U.S. 648, 656, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045.

■ In determining whether a defendant has been denied his right to the effective assistance of counsel, the Court has adopted a "fact-sensitive analysis" which seeks to measure "the quality and impact of counsel's representation under the circumstances of the individual case." (2 W. LaFave & J. Israel, Criminal Procedure §11.10, at 28 (Supp. 1988).) Thus, in alleging ineffectiveness, a defendant must prove that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." (*Strickland,* 466 U.S. at 688, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068; see also *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome," and defendant bears the burden of showing that, absent counsel's errors, "the factfinder would have had a reasonable doubt respecting guilt." (*Strickland,* 466 U.S. at 694, 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In determining whether there has been ineffective assistance, a court must consider "the totality of the [circumstances]" and determine "whether counsel's assistance was reasonable considering all the circumstances." *Strickland,* 466 U.S. at 695, 688, 80 L. Ed. 2d at 698, 694, 104 S. Ct. at 2069, 2065.

In adopting a "judgmental approach" (2 W. LaFave & J. Israel, Criminal Procedure §11.7 (1984)), the Court noted:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be

considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

■ In our application of the foregoing authorities to the defense's conduct of the trial of the case at bar we are especially mindful of the standard set forth in *Strickland* that claims of ineffective assistance of counsel are generally to be resolved on a case-specific basis, and not by *per se* rulemaking. The instant case is not one in which the proof of guilt can fairly be said to be overwhelming or even enormous. It is, in fact, one where the evidence was closely balanced, for although the State presented the testimony of the sole eyewitness in an attempt to link defendant with the crime, there were discrepancies in her description of the alleged assassin which cannot be regarded in any way as insignificant. The jury was not told about all of the inconsistencies in her story, and there is a reasonable probability that these omissions influenced the outcome of the proceedings.

Although Detective Bogucki attempted to explain some of the inconsistencies in Donna's descriptions of the attacker, she was not confronted with her prior descriptions of the offender, particularly that in which she described the assailant as having a scar over one of his eyes as well as a scar and a tattoo on one of her arms. Nor was she interrogated as to whether or not she told Andrea Zeman a version of the incident different from the one she gave the police.

■ Contrary to the State's suggestion, trial counsel could not have made a tactical decision not to submit the photographs of Ronan and Ulbert for the jury's review, because he simply failed to obtain them and in fact never saw them. It was not until the hearing was held on the post-trial motion that defense counsel first obtained the photographs and had them admitted into evidence. Nor do we agree with the State that the defense's failure to call witnesses to corroborate defendant's testimony was simply a trial stratagem. We can conceive of no sound tactical reason not to call defendant's sister, Groves and Mroczka; moreover, the consequence of counsel's failure to do so was the abandonment of a defense after defendant had pointedly presented it in his testimony. Failure to adequately investigate and develop an available defense has been found to be ineffective assistance (*People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973), as has failure to present available witnesses to corroborate a defense (*People v. Solomon* (1987), 158 Ill. App. 3d 432, 511 N.E.2d 875).

■ We find it necessary to reiterate that the evidence in this case is very closely balanced, with only one witness identifying defendant as the offender; an identification, as we have already noted, not without its debilities. In its deliberations, the jury necessarily weighed

Donna's credibility as a witness against that of defendant, a determination, we deem it reasonable to conclude, that could have been different had it been given all the relevant information. Although any one error, by itself, may not amount to ineffective assistance of counsel, cumulatively, counsel's failures render the result of the proceedings "unreliable under the standard enunciated in *Strickland*." (*Solomon*, 158 Ill. App. 3d at 437.) We therefore reverse defendant's conviction and remand his case for a new trial. In view of our ruling, we need not address defendant's remaining contentions of error, many of which are cognate to his counsel's failures during trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and this cause is remanded for further proceedings.

*Reversed and remanded.*

EGAN, P.J., and HARTMAN, J., concur.