THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARD MOORE, Defendant-Appellant.

First District (3rd Division)    No. 1—93—0476

Opinion filed June 29, 1994.—Rehearing denied August 10, 1994.

Gary Ravitz, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a bench trial, defendant Edward Moore was convicted of armed robbery, armed violence, multiple counts of aggravated battery and unlawful use of a weapon by a felon. Defendant was sentenced to concurrent prison terms of 20 years, 20 years and 3 years for the offenses of armed robbery, armed violence and unlawful use of a weapon by a felon, respectively. In addition, a consecutive prison term of four years was imposed for one count of aggravated battery.

On appeal, defendant raises four issues: (1) whether defendant was denied effective assistance of counsel because trial counsel failed to elicit, as he had forecasted in opening statements, the discrepancies between the witnesses' pre-arrest descriptions of the perpetrator and defendant's actual appearance; (2) whether the admission of evidence and testimony regarding a motel key which was recovered at the crime scene constituted inadmissible hearsay and reversible error; (3) whether defendant was improperly sentenced for the offenses of aggravated battery and unlawful use of a weapon by a felon because no judgments of convictions were entered and the findings themselves merged with other convictions; and (4) whether defendant's conviction of unlawful use of a weapon by a felon and the related three-year prison term should be vacated because there was no evidence that defendant had a prior felony conviction.

For all the reasons which follow, we vacate the conviction for unlawful use of a weapon by a felon and the three-year sentence imposed for that offense. We also vacate the four-year sentence imposed for one count of aggravated battery. We affirm the remaining convictions and sentences.

Defendant's convictions derive from the armed robbery of the

two owners of a tavern known as the Terminal Lounge at 1:30 p.m. on August 23, 1991.

At trial the State presented seven witnesses: Anastasios Antonakos and Nick Mavraganis (the two victims and co-owners of the tavern); Rodney Amos and Renardo Dase (two occurrence witnesses); Barry Jackson (a witness relocation officer for the Cook County State's Attorney); Caprice Lindsey (a motel employee); and Detective Patrick Sullivan (the investigating officer).

Antonakos and Mavraganis were working at their bar when two men entered to rob them. One offender vaulted the counter, pointed a gun in Antonakos' face, ordered him to lay down, grabbed his throat, choked him, hit him and shoved him to the ground. The offender also used his gun to shove Mavraganis and force him to the ground.

The second offender remained in the front room and demanded the location of any money. When Mavraganis replied "What money?" the second offender fired two shots in succession and then a third shot, which hit Mavraganis in the ankle. The offenders fled with an estimated $15,600.

Seven or eight patrons were in the bar at the time of the robbery. One patron found a set of keys at the front of the bar and presented the keys to Antonakos, saying "Hey, this guy [referring to a robber], he dropped these keys." Antonakos could not remember who handed him the keys but he passed them to the police when they arrived. Among the keys was a key to room 114 of the Avenue Motel.

Neither Antonakos nor Mavraganis was able to identify the offenders.

Rodney Amos and Renardo Dase testified that they were standing under a viaduct with some friends near the Terminal Lounge shortly before the robbery. Amos and Dase noticed two men pass them and enter the tavern. Shortly thereafter, they saw a man exit the bar and yell that "guys with guns" were in the bar.

Amos next heard three gunshots and then observed the same two men who earlier had passed him exit the bar and drive away in a late model, dark-colored Buick or Oldsmobile.

Amos gave a statement to the police that same day and described defendant as having a beard and a pony tail, and wearing a baseball cap which may have been black and may have had an insignia like a mermaid on it. Amos testified that what he thought was a beard could have been the shadow from the baseball cap.

On re-cross-examination, Amos testified that from the location (under a viaduct), where he and his friends were standing before the robbery, he could not actually see people enter the tavern, but he

saw shadows that appeared to enter the lounge and heard the tavern door close. However, Amos clearly observed defendant leave.

Amos identified defendant on three occasions. First, on August 29, 1991, Amos reviewed about five photographs provided by Detective Sullivan and identified defendant from the group of pictures. Second, on September 4, 1991, Amos chose defendant from a lineup at a police station at 1:20 p.m. Third, on July 10, 1992, Amos identified defendant in court at trial.

Dase testified that he saw three men, one of whom had a rifle, run out of the bar and jump into a vehicle described as a late model, dark-colored, four-door Buick or Oldsmobile. Dase recalled that on the day of the robbery, defendant was wearing a baseball cap with rhinestone lettering on it forming the name of a team and low-top, purple and white gym shoes. Dase denied that he told the police that defendant had a gheri curl hairstyle and testified that defendant's hair was pulled back in a ponytail.

Dase identified defendant on the same three occasions as Amos but did so separately from Amos: from a photo array, at a police lineup on September 4 at 6:45 p.m. and in court.

Barry Jackson testified that he is a Cook County sheriff's police officer assigned to the Cook County State's Attorney office as a relocation officer. Defendant entered the witness protection program as a witness in a murder case. From July 23, 1991, until August 19, 1991, defendant was placed at the Avenue Motel in room 114. Thereafter, defendant was relocated to a Chicago Housing Authority (CHA) apartment. The CHA apartment, however, was leased by Wanda Davis, defendant's girlfriend, and was a secured building, meaning that nontenants may not live there. Under the rules of the CHA, defendant might visit but not live there. Jackson explained to defendant that there was a possibility that the CHA would not permit him to reside with Wanda. However, Jackson arranged to have defendant's belongings moved from the Avenue Motel to a CHA apartment.

Ms. Caprice Lindsey, an employee of the Avenue Motel, identified the motel key recovered at the crime scene as the key to room 114 of the Avenue Motel. Lindsey explained that a log is kept of guests checking in and out of the motel. Based on the log, defendant checked into room 114 with the State's Attorney's relocation program on July 23, 1991, but never formally checked out and never returned the keys. However, Lindsey testified that defendant, who stayed in the room with a woman and child, could not have remained at the motel after August 19. A bill sent to the State's Attorney's office indicated hotel charges for defendant and his family for the time period July 23 to August 19, 1991.

Detective Patrick Sullivan was assigned to investigate the armed robbery at the Terminal Lounge. When he arrived at the tavern, Sullivan interviewed the patrons present and determined the amount of money missing. Sullivan's investigation led him to the Avenue Motel because "[t]here was a room key from apartment 114 of the Avenue Hotel recovered on the bar at the time subsequent to the robbery."

At the Avenue Motel, Sullivan spoke to motel employees and then contacted an assistant State's Attorney regarding the witness protection program. Sullivan learned that defendant was in custody as a suspect for the armed robbery and conducted a lineup on the same evening (August 23). Antonakos viewed the lineup but could not identify defendant.

On August 29, 1991, Sullivan located Dase about 1:30 p.m. and Amos about 3:30 p.m. near the Terminal Lounge. Sullivan displayed five photographs and both Dase and Amos separately identified defendant from the group of pictures as the man they had seen going into the tavern shortly before the robbery.

Sullivan obtained an arrest warrant for defendant and executed the warrant on September 4, 1991, at the CHA apartment occupied by defendant and Davis. A search of the apartment revealed eight live bullets, one photograph of defendant displaying money and four photographs of Wanda Davis in various stages of undress with money piled on her. Sullivan also recovered a traffic ticket and a vehicle registration on a four-door Buick Electra in defendant's name. Outside the apartment, defendant identified a rust-colored, late 1970 Buick Electra 225 as his car.

At the police station, defendant stated that he had been in the witness protection program, resided in room 114 of the Avenue Motel from July 23 to August 19 and then relocated to the CHA apartment because he was costing the State too much money staying in the motel.

On cross-examination, Sullivan testified that during the search of defendant's apartment at the time the arrest warrant was executed, Sullivan did not find any purple tennis shoes, a gun, any $100 bills, a hat with rhinestones on it or a camera. Although bullet fragments recovered at the crime scene could not be identified, Sullivan found .22-caliber bullets in defendant's apartment.

The defense presented two witnesses: Wanda Davis and Willie Jones, the father of Wanda Davis. Davis testified that on the day of the robbery (August 23), she lived with defendant and their two children at the CHA apartment. Around noon defendant was at home watching television. From approximately 1 to 2 p.m., defendant, together with Davis and her father, moved items, such as clothing

and a fish tank, from the car of Davis' father into the apartment. Defendant stayed in the apartment the remainder of the day until he was told to leave since he was not included on the lease. When defendant left the building, the police took him into custody.

Davis stated that the photographs removed from the apartment at the time of defendant's arrest were taken around December 1988 at an apartment where they lived prior to entering the witness relocation program. The money shown in the photographs, according to Davis, derived from defendant's earnings when he was working at Sams Food and Liquor and was used to purchase a car.

On cross-examination, Davis testified that in 1988 defendant worked at Sams Liquor Store as a janitor and stock man about 9 to 11 hours a day for $3.50 an hour, amounting to $242 per week. The 1978 Buick cost $1,500. Davis lived with defendant in room 114 at the Avenue Motel July 1, 1991, to August 19, 1991. Davis leased the CHA apartment on August 14 and moved on August 19. The State's Attorney's office moved their furniture on August 20 or 21.

Willie Lee Jones corroborated Davis' testimony about moving items into the CHA apartment with Davis and defendant on the day of the robbery between 1 and about 1:45 p.m.

The trial court acquitted defendant of attempted first degree murder and convicted him of armed robbery, armed violence, multiple counts of aggravated battery with a firearm and unlawful use of a weapon by a felon.

At the December 21, 1992, post-trial motion proceeding, the parties stipulated that in August 1991 defendant was 6 feet 3¹/₂ inches tall, weighed about 200 pounds and was a light-complected African-American.

In addition, Davis testified that she did not discuss her trial testimony with defendant's trial counsel before testifying and she provided receipts for payments made to defense counsel. On November 15, 1991, Davis made a payment to trial counsel's secretary and told the secretary that a CHA security guard (Leonard Oliver) was prepared to testify that he remembered Davis and defendant on August 23 moving furniture in and out of the apartment building. On December 12, 1991, Davis told trial counsel in court that she had a check-out receipt from the Avenue Motel at home. Trial counsel said he would call Davis but he never called to discuss the receipt. On the second day of defendant's trial in July 1992, Davis brought the check-out receipt to court and tendered it to trial counsel, who said that he did not need it.

The trial court denied defendant's original and supplemental post-trial motions and then proceeded to sentencing.

On appeal defendant first asserts that he was denied effective assistance of counsel because his trial counsel failed to utilize the statements made by Amos and Dase to the police near the time of the robbery to elicit the discrepancies between the descriptions given by the witnesses shortly after the robbery and the actual physical appearance of defendant even though trial counsel had argued in opening statements that he would present such evidence.

In addition, defendant maintains that his trial counsel failed to challenge the assumption implicit in Lindsey's testimony that defendant never returned the room key where Lindsey had previously told the police that she did not know whether defendant had returned the key on August 19, 1991, and where Davis gave the motel receipt to trial counsel, who failed to use it.

The State contends that defendant's trial counsel thoroughly and professionally conducted a proper cross-examination of the State's witnesses by questioning their ability to adequately observe defendant and attempted to discredit their testimony. Trial counsel's conduct, the State argues, did not result in prejudice to defendant.

It is well established that the relevant standard for evaluating the performance of counsel was established in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and was adopted in Illinois in *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, 473 N.E.2d 1246. *People v. Strickland* (1992), 154 Ill. 2d 489, 510, 609 N.E.2d 1366.

To prevail on an ineffective-assistance claim, a defendant must establish that counsel's performance was deficient and that he was prejudiced as a result of counsel's deficient performance. (*Strickland*, 154 Ill. 2d at 510.) To establish such prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Albanese*, 104 Ill. 2d at 525.) If no prejudice to the defendant is established, then there is no need to determine separately whether counsel's performance was deficient. *Strickland*, 154 Ill. 2d at 510.

In his opening statement, defense counsel commented, in relevant part, as follows:

> "Yes, there may be certain witnesses that may identify him [defendant], Judge, but I know your honor will take notes, we would ask you to take notes as to the ability of them to observe, their ability to recollect and the descriptions that they gave at the time the police arrived before any offenders were taken into custody."

Defendant relies on two cases for the proposition that a trial counsel's failure to impeach with evidence of a witness' prior descrip-

tion which varies from the defendant's actual description constitutes prejudicial error. *People v. House* (1990), 141 Ill. 2d 323, 566 N.E.2d 259; *People v. Garza* (1989), 180 Ill. App. 3d 263, 535 N.E.2d 968.

These cases, however, are distinguishable from the present case because the defendants in *House* and *Garza* were prejudiced not merely for the failure to impeach but also from the cumulative effect of the defense counsels' deficient conduct. In *House*, the court considered not only the absence of a victim's generally exculpatory hospital statement describing her assailants but also the testimony of alibi witnesses and other exculpatory evidence which may have been improperly excluded. In light of all these factors, the court concluded that its confidence in the outcome of the trial was undermined. *House*, 141 Ill. 2d at 389.

Similarly, in *Garza* this court considered the cumulative effect of defense counsel's ineffective performance: failure to inform the jury of the inconsistencies in the sole witness' description of the murderer, failure to question the sole eyewitness about a different version of the incident recounted to another person who was not allowed to testify, failure to submit photographs of two men who were selected by the eyewitness from a mug book, failure to call witnesses who could corroborate the defendant's alibi testimony and failure to call other available defense witnesses. From the cumulative effect of the defense counsel's conduct, this court in *Garza* concluded that "[a]lthough any one error, by itself, may not amount to ineffective assistance of counsel, cumulatively, counsel's failures render the result of the proceedings 'unreliable under the standard enunciated in *Strickland.*' " *Garza*, 180 Ill. App. 3d at 270, quoting *People v. Solomon*, 158 Ill. App. 3d 432, 437.

The State directs attention to two cases where the defendants contended that their defense counsel failed to effectively cross-examine witnesses as to the identification of the offenders. *People v. Davis* (1992), 228 Ill. App. 3d 123, 592 N.E.2d 464; *Williams v. Chrans* (7th Cir. 1990), 894 F.2d 928.

In *Davis*, the defendant was convicted in a bench trial of robbery and burglary of an automobile for a "smash and grab" incident while a car was stopped at a red light at night. During the cross-examination of the only identifying witness presented by the State, defense counsel challenged the witness' ability to identify the defendant as the offender considering the darkness of night, the number of people in the area at the time of the crime and the distance from which the witness viewed the crime. (*Davis*, 228 Ill. App. 3d at 128.) This court held that the defendant's right to effective assistance of counsel was not violated because defense counsel "attempted to

impeach, undermine and obfuscate the witnesses' testimony" and counsel's questions elicited "responses that raised pertinent questions as to defendant's guilt." *Davis*, 228 Ill. App. 3d at 128.

In *Chrans*, the two defendants were convicted of the armed robbery of the owner of a grocery store. Again, the defendants failed to overcome the presumption that their counsel's actions rested within the domain of acceptable trial strategy and reasoned that "defense counsel extensively cross-examined [the victim] on his ability to observe his attackers prior to and during the crime and the discrepancies between his description of the robbers and [the defendants'] physical appearances." (*Chrans*, 894 F.2d at 935.) The court concluded that it could not say that defense counsel had ineffectively cross-examined on the crucial identification question. *Chrans*, 894 F.2d at 935.

The State also relies on *United States v. McKinney* (7th Cir. 1992), 954 F.2d 471, where the defendant complained that his counsel failed to confront a witness with his prior inconsistent statements but had extensively cross-examined the witness, elicited a number of reasons for the witness to fabricate his testimony, probed the inconsistencies in his testimony and presented other testimony which undermined the witness' credibility. *McKinney*, 954 F.2d at 481.

Defendant attempts to distinguish these three cases (*Davis*, *Chrans* and *McKinney*) because defense counsel, in his opening statement, promised to address the pre-arrest descriptions of the offenders. This distinction, however, even if viable, applies equally to the cases relied on by defendant (*House* and *Garza*).

■ The record in the present case reveals that defense counsel challenged the ability of Amos and Dase to identify defendant based on the location of Amos and Dase (under a viaduct without access to a direct view of the tavern's entrance), the short time for the witnesses to view defendant as he walked past them and some disparities (such as different hairstyles and a possible beard) or omissions in their descriptions to the police.

Moreover, defendant obliquely concedes that defense counsel vigorously challenged the identifications of defendant by Amos and Dase by eliciting testimony that they had never seen defendant prior to the day of the robbery, only observed defendant for a few seconds as he walked by and viewed the defendant while standing under a viaduct. In addition, Amos had been drinking before the robbery and Dase was not sure that defendant was one of three men he saw exiting the tavern after the robbery. Regarding the photo display, Amos testified that he selected defendant's picture because "it favors the guy" he observed and Dase testified that defendant's "picture [was] like the guy."

Furthermore, while cross-examining Detective Sullivan about his search of defendant's apartment, defense counsel elicited testimony that no purple gym shoes or a hat with rhinestones was found even though Dase had testified that defendant was wearing such clothing on the day of the robbery. As to the failure to use the motel checkout receipt, silence might have been the proper strategy since more than one key could have been issued to defendant or Davis. Additionally, defense counsel presented two alibi witnesses.

In light of defense counsel's performance and three identifications by two occurrence witnesses, we do not believe that defendant suffered sufficient prejudice, or, for that matter, any prejudice, to establish ineffective assistance of counsel.

Second, defendant asserts that the trial court committed reversible error by allowing the evidence and testimony regarding the motel key which constituted inadmissible hearsay.

The State contends that the testimony of Antonakos regarding the motel key was not offered as an out-of-court statement used to prove the truth of the matter asserted but rather was offered as circumstantial evidence for another purpose, *i.e.*, to explain the tavern patron's conduct in passing the motel key. Alternatively, the State maintains that if the admission of the motel key was inadmissible hearsay, the error was harmless.

An out-of-court statement constitutes hearsay if it is offered to establish the truth of the matter asserted and, on the other hand, testimony about an out-of-court statement is not hearsay if it is used for a purpose other than to prove the truth of the matter asserted. *People v. Simms* (1991), 143 Ill. 2d 154, 173, 572 N.E.2d 947.

Defendant primarily relies on *People v. Escobar* (1979), 77 Ill. App. 3d 169, 395 N.E.2d 1028. In *Escobar*, the defendant was convicted of murder for driving a car which carried a gunman who fatally shot the victim. The State's only occurrence witness testified that he gave a bullet shell casing to the police after he had been told it was found in the back seat of the defendant's car. The *Escobar* court rejected the State's assertion that the evidence was introduced, not as hearsay, but to explain why the witness brought the shell to the police. The court reasoned that "the danger that the jury would misuse the evidence is so much greater than the value of detailing why [the witness] thought the shells were important that the evidence should have been excluded." (*Escobar*, 77 Ill. App. 3d at 177.) We do not necessarily endorse what appears in *Escobar* to be a weighing of the question as to whether hearsay should be admitted since an objective standard, time-honored exceptions and the issue of relevancy are the matters to be considered. Furthermore, the *Esco-*

*bar* court found that the forbidden use of this testimony was evident when the State in closing argument declared that the only thing known about the shells is that they came from the defendant's car. *Escobar*, 77 Ill. App. 3d at 177.

In the present case, Antonakos testified that an unidentified and unknown bar patron told him that one of the robbers dropped the motel key. Defense counsel objected on the ground that Antonakos was testifying to a hearsay conversation. The trial court ruled "I am going to permit it only for the purpose of indicating that keys were passed, not necessarily for the truth of the matter."

■ Contrary to the State's attempt to circumvent the hearsay implication of Antonakos' testimony, we believe that the testimony constitutes classic inadmissible hearsay. Similar to the testimony in *Escobar*, the obvious purpose of the testimony was to establish the truth of the matter asserted, *i.e.*, the keys belonged to one of the robbers.

Our inquiry then becomes whether the admission of this hearsay constitutes reversible error. Reversal is not automatically warranted where hearsay evidence is admitted. (*E.g., People v. Chevalier* (1989), 131 Ill. 2d 66, 77-78, 544 N.E.2d 942.) Where there is no reasonable probability that the jury would have acquitted the defendant if the hearsay evidence had been excluded, the admission of the hearsay evidence is harmless error. *People v. Trice* (1991), 217 Ill. App. 3d 967, 978, 577 N.E.2d 1195.

Moreover, the admission of hearsay evidence constitutes harmless error where there is uncontroverted eyewitness testimony sufficient to sustain a conviction because, in that event, there is no reasonable possibility that the verdict would have been different had the hearsay been excluded. *People v. Jones* (1983), 114 Ill. App. 3d 576, 589, 449 N.E.2d 547 (the contested testimony was admissible to explain a police officer's investigatory conduct and even if it was hearsay, two eyewitnesses with an adequate opportunity to observe identified the defendant as the offender).

We believe that the admission of the hearsay testimony was harmless error because the properly admitted evidence, especially three identifications by two occurrence witnesses, obviates the reasonable probability that an acquittal would have obtained if the hearsay had been excluded.

Moreover, defendant acknowledged at oral argument that the motel key could have been admitted as part of the investigatory procedures employed by the police. Testimony regarding the investigative steps taken by a police officer is admissible. (*Simms*, 143 Ill. 2d at 174; *People v. McNeal* (1987), 160 Ill. App. 3d 796, 800, 513

N.E.2d 897.) If Detective Sullivan explained merely that the key was recovered at the crime scene, no hearsay problem would have occurred. .

■ Third, defendant correctly asserts and the State agrees that no evidence was presented to demonstrate that defendant had a prior felony conviction which is required to convict for the offense of unlawful use of a weapon by a felon. Ill. Rev. Stat. 1991, ch. 38, par. 24—1.1 (now 720 ILCS 5/24—1.1 (West 1992)); *People v. Palmer* (1984), 104 Ill. 2d 340, 472 N.E.2d 795.

Accordingly, we vacate the conviction of unlawful use of a weapon by a felon (count VIII) and the related three-year prison sentence.

Lastly, defendant asserts that the four-year sentence imposed for the offense of aggravated battery as charged in count VI was improper because no judgment of conviction was entered for count VI. Defendant also argues that the trial court merged count VI with the convictions for armed robbery (count II) and armed violence (count III) and thus, a separate sentence for count VI was error.

The State contends that this sentencing issue should be remanded for clarification because the trial court entered a conviction on count VI but then improperly merged count VI with count III (armed violence). The merger was improper, the State submits, because count VI related to Antonakos while count III related to Mavraganis.

"[A] sentence cannot be imposed for a charge upon which a judgment of conviction has not been entered." (*People v. Johnson* (1985), 133 Ill. App. 3d 881, 884, 479 N.E.2d 481.) A judgment of conviction is defined as the trial court's entry of judgment on a verdict of guilty. *People v. Franklin* (1990), 135 Ill. 2d 78, 106, 552 N.E.2d 743.

Judgment is defined in the Code of Criminal Procedure of 1963 and the Unified Code of Corrections as "an adjudication by the court that the defendant is guilty or not guilty and if the adjudication is that the defendant is guilty it includes the sentence pronounced by the court." 725 ILCS 5/102—14 (West 1992); 730 ILCS 5/5—1—12 (West 1992).

■ In the present case, the trial court clearly found defendant guilty of all the charged offenses with the sole exception of attempted first degree murder. After finding defendant not guilty of attempted first degree murder, the trial court enumerated the remaining charged offenses and ruled "[t]here's a finding of guilty on all of them." The trial court proceeded, however, to enter judgment only on the armed robbery and armed violence counts. Accordingly, we vacate the four-year sentence imposed for the offense of aggravated battery (count VI).

■ Moreover, even if judgment of conviction had been entered, the trial court improperly attempted to merge count VI with count III. When questioned by the assistant State's Attorney, the trial court reiterated its ruling and further stated that count VI (aggravated battery) merged with count III (armed violence). Count III of the indictment charged defendant with armed violence for conduct which "caused great bodily harm to Nick Mavraganis by shooting him." Count VI of the indictment charged defendant with aggravated battery for conduct which "caused bodily harm to Antonakos while using a deadly weapon, to wit: a gun by striking him about the face with said gun." Thus, each count was directed at conduct relating to two different victims.

Affirmed in part and vacated in part.

TULLY, P.J., and CERDA, J., concur.