THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEVIN MARSHALL, Defendant-Appellant.

First District (2nd Division)   No. 1—90—2399

Opinion filed October 19, 1993.

Michael J. Pelletier, Kenneth L. Jones, and Mary Ellen Dienes, all of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Linda J. Jakubs, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Kevin Marshall was convicted after a bench trial for possession of a controlled substance, in this case 497.3 grams of cocaine, with intent to deliver. He was sentenced to 14 years in the custody of the Illinois Department of Corrections. On appeal he urges that the following grounds warrant reversal of his conviction: (1) that due to the trial court's granting of the State's oral motion for substitution of judges, a motion which did not comport with the procedural dictates of the statute, the court lacked jurisdiction over the cause thereafter; (2) that the court erroneously admitted evidence of defendant's prior arrests for suspected possession of a controlled substance; (3) that the performance of his attorney at trial, by failing to present available witnesses who would buttress the testimony of his mother, was so professionally deficient as to amount to a deprivation of effective assistance of counsel; and (4) that he was not proven guilty beyond a reasonable doubt. He also argues that his sentence of 14 years' incarceration is excessive and should be reduced to the statutory minimum of 12 years. We disagree and accordingly affirm both his conviction and sentence.

On May 19, 1989, a grand jury indicted defendant along with co-defendant Lynetta Jones for violating section 401(a)(2) of the Illinois Controlled Substances Act. (Ill. Rev. Stat. 1989, ch. 56$^1$/2, par. 1401(a)(2).) At his arraignment, after he pleaded not guilty and the case was assigned to a circuit court judge's calendar, the State orally moved the court for a substitution of judges, which was granted. Defendant thereafter waived his right to a jury.

At trial, Chicago police officer Kevin Oakes testified that at approximately 7:45 p.m. on May 19, 1989, he and his partner, Officer David Friel, had the home of a suspected narcotics dealer, who resided on the city's far southwest side, under surveillance. The officers went to that address because Friel had received a tip earlier in the day that narcotics were being stored and sold there. The tip indicated that the drugs were housed in the trunk of a 1980 Buick, parked behind the residence. Both officers testified that they were familiar with that address because they had made drug-related arrests there in the past, including multiple arrests of defendant.

The two officers took observation positions opposite each other and adjacent to the rear of the house, and kept in contact via radio. Oakes observed two vehicles parked in the backyard of that address, a van and a gray Buick. Sometime after the officers began their surveillance, defendant emerged from the rear of the home, proceeded to the Buick, unlocked its trunk with a key, and withdrew a large clear resealable plastic bag which held a sizable amount of a white powdery substance. He took a quantity of the powder out of the large bag and transferred it to a smaller, clear plastic bag. He then resealed the larger bag, returned it to the trunk of the Buick, and went back to the residence.

A short time later, defendant reappeared, this time accompanied by a woman whom Oakes identified as the codefendant. Defendant again retrieved the clear plastic bag from the trunk of the Buick, this time placing it in a brown paper bag, and headed toward the front of the residence with codefendant in tow. The officers elected to pursue the two and therefore drove their vehicle around to the front of the building, whereupon they again saw defendant holding a brown paper bag. As soon as defendant appreciated who, in fact, the officers were, he handed the bag to codefendant, shouted "Run, Lynetta, run," and he himself then raced from the scene. Oakes pursued codefendant, who ran toward the back of the residence, and upon reaching the van parked there, opened its door and tossed inside the brown sack she carried. Oakes apprehended codefendant and secured the bag, wherein he observed a "zip-lock"-type clear plastic bag filled with a white powder. The parties stipulated that the powder was 497.3 grams of cocaine.

Officer Friel also testified and his narration of the events that took place on the evening of the incident was largely consistent with that of Oakes, adding only that he chased defendant when he fled from the scene after he had given the cocaine to codefendant, but the officer was unable to apprehend him. On cross-examination, defense counsel emphasized a discrepancy between Oakes' statement that the cocaine was originally kept only in the plastic bag and later transferred to the paper sack and Friel's recollection that the plastic bag was always housed in the paper sack.

After the State rested, defendant renewed his motion for a severance, which, this time, was granted. Defendant first called Valerie Beck whom he had been dating for approximately one month prior to the night in question. That night she went to defendant's home in order to watch television with him. Around 7:30 p.m., while in the upstairs washroom, she overheard a conversation between defendant and codefendant being held by the side door. When she returned

downstairs, she learned that while she had been out of the room, defendant's friend Jeffrey had arrived. She also observed defendant as he stood just outside the side door of the home, apparently engaged in a conversation with codefendant. From this vantage point, Beck saw codefendant remove a clear plastic baggie from a paper sack and heard her ask defendant its value. She could not, however, hear defendant's response because, upon hearing the question, she decided that whatever was unfolding between the two was none of her business. She therefore returned to the living room. About two or four minutes later, defendant raced into the home and informed her that the police were chasing codefendant.

Jeffrey Harris next testified for defendant and, after admitting that he and defendant had been friends since their youth, he related that on the evening of May 19, 1989, he visited defendant at his home. He came to the home from its front, walking through a vacant field to its east. He recalled that as he approached the home, he had a clear view of a woman he knew as Lynetta, as she exited an auto parked in front of defendant's home and went to the side entrance of the residence. Harris reached the side entrance at about the same time as codefendant, and, after answering the door, defendant asked codefendant what she wanted and then invited Harris into his home. Harris recalled that codefendant told defendant that she had something to discuss with him and withdrew from her purse a brown paper bag. After witnessing these events, Harris went to the couch to watch television, where he was soon joined by a woman. Defendant rushed in a few minutes later, announcing that the police were chasing codefendant.

Defendant's mother, Jean Marshall, testified that she owned the gray 1980 Buick which she kept parked behind her home, where she resided with defendant. She informed the court that on May 19, 1989, there was no trunk key for the Buick because in October 1988, she had had all the locks to the car removed with the exception of the one on the driver's door. On cross-examination, the State elicited that the trunk was accessible on the day of the offense, but that it could be opened only by pressing an automatic release button located in the glove compartment. And on redirect, she clarified that the automatic release operated only if the ignition was turned on.

In rebuttal, the State called codefendant, who stated that although she was at defendant's home between 7:30 and 7:45 p.m., she did not see Jeffrey Harris, whom she knew by sight, nor Valerie Beck, whom she had previously seen once or twice. She further denied retrieving a brown paper bag from her purse or ever possessing a clear, plastic bag. Officer Friel also retook the stand and disputed

having seen anyone at the premises except defendant and codefendant, but he admitted that his surveillance position did not allow him to observe the front of the home.

In surrebuttal, defendant stated that codefendant had telephoned him on the evening of May 19, 1989, telling him that she would be coming to his home. Although he implored her not to come because his girl friend was already there, she nonetheless arrived soon after hanging up on him. He agreed with Harris that codefendant and Harris appeared at the door contemporaneously. After defendant asked Harris in, codefendant pulled a bag out of her purse. Codefendant asked him to come outside with her, which he obliged, walking about two feet from the screen door. She then unrolled the bag and pulled out a freezer bag, inquiring of defendant the value of its contents. He was immediately startled, having never seen a quantity of cocaine that great. He recovered his senses and ordered her out of his neighborhood. As she was putting the bag back into her purse, he wondered aloud where she had obtained the cocaine and she informed him that she had stolen it from her boyfriend after a fight concerning the paternity of her child. He then saw an unmarked police car with its occupants exiting. Immediately thereafter, codefendant turned and began to run toward the back of his home. He reentered the residence and informed Harris and Beck that the police were pursuing codefendant.

After the court found defendant guilty as charged, he filed a post-trial motion wherein he urged acquittal or a new trial because, *inter alia*, his counsel had been ineffective. The primary basis of this claim was that trial counsel failed to call or interview available witnesses who would buttress his mother's attestation that, on the day of the offense, there was no conceivable way that he could have gained access to the trunk with a key. To his motion, he attached multiple affidavits including that of the mechanic who removed the lock, his employer who had observed him do so, and a friend of defendant's mother who had used the auto before and knew that the trunk could not be opened from the outside. The court denied the motion, determining that because the proffered affidavits went only to prove the condition of the lock at points earlier than the date of the offense, they were irrelevant to the facts in consequence, *i.e.*, the condition of the trunk on May 19, 1989. After denying his motion for a new trial, the court sentenced defendant to 14 years in the custody of the Illinois Department of Corrections. This appeal followed.

I

Defendant first maintains that due to the granting of the State's

technically deficient motion for substitution of judges, all the proceedings subsequent to that infirm order by the circuit court were conducted without jurisdiction; as a result, all of its subsequent rulings were necessarily nugatory. This would include his conviction and sentence. He concludes, therefore, that his conviction must be reversed and the cause remanded to a court properly endowed with jurisdiction over the action.

Section 114—5(c) of Code of Criminal Procedure of 1963 allows the State to move the court seeking a substitution of judges. (Ill. Rev. Stat. 1989, ch. 38, par. 114—5(c).) If this motion is timely and in proper form, the State, like the accused, is vested with an absolute right to a change of venue. (See *People ex rel. Baricevic v. Wharton* (1990), 136 Ill. 2d 423, 430, 556 N.E.2d 253, 255 ("Section 114—5 was amended in 1987 to grant the State the same right to substitute judges that previously had been enjoyed by defendants[, a right which] *** has long been interpreted by this court as being *** 'absolute' ***").) Defendant argues that the motion here was not in proper form, having been brought orally, and that the State failed to make even a bare allegation of prejudice, an averment required by the act; therefore, pursuant to the statute, it was error for the trial court to grant the motion.

■ Although we agree that, in conformity with the statute, in order to avail itself of the absolute right to demand a substitution of judges, the State, like the defendant, must present its motion in writing, containing the allegation of prejudice (*People v. Agnew* (1983), 97 Ill. 2d 354, 454 N.E.2d 641 (agreeing with the appellate court that section 114—5 explicitly calls for a motion in writing); see also *People v. Burns* (1989), 188 Ill. App. 3d 716, 544 N.E.2d 466 (holding that to qualify for an automatic substitution of judges, the defendant must adhere to the express requisites of section 114—5)), we note that defendant here did not apprise the court or the State of these glaring deficiencies when the oral motion was first made. The following colloquy is all that occurred when, after defendant entered his plea of not guilty, the State registered its objection to the judge to whom the action had been assigned:

"THE COURT: Judge Joyce [(which presumably indicates that the action was being assigned to Judge Joyce)].

[Counsel for the State]: Judge, the State would SOJ Judge Joyce.

THE COURT: Motion State, substitution of judge, over Defendant's strenuous objection.

Judge Singer."

While this exchange does signify that defendant objected to the State's motion, it does not disclose the basis of the objection, but only

the incidence thereof. Giving due regard to the presumption created by Supreme Court Rule 608 (134 Ill. 2d R. 608) that any question which arises from an incomplete record is to be resolved against the appellant (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944), we must assume that defendant's strenuous objection went to the merits of the State's motion, as opposed to its form. Thus, following *Edwards*, defendant must be deemed to have waived any objection to the form of the State's motion, which would include those technical deficiencies he now complains of on appeal.

Moreover, on a purely pragmatic level, given the fact that the oversight on the part of the State could have been very easily and fully rectified if defendant had only registered his specific concerns as to its form at the appropriate time, this would appear to be the ideal instance for us to apply the waiver doctrine. It would be exceedingly unfortunate to allow defendant to benefit from his silence here, considering that the State's mistake accrued no real advantage to it and posed no meaningful hardship to defendant. Consequently, for this reason as well, we hold that defendant, by not questioning, at the proper time and place, the State's noncompliance with the procedural commands of section 114—5(c) has waived any complaints in that regard for the purpose of appeal. See *People v. Hicks* (1970), 44 Ill. 2d 550, 556, 256 N.E.2d 823, 826 ("While it is true that lack of compliance [with the form of the motion mandated by then section 114—5(c)] might have justified a refusal of the court to entertain the motion, the deficiencies in the motion were not raised below and the procedural requirements of the statute appear to have been waived by court and counsel alike"); see also *People v. Curtiss* (1984), 126 Ill. App. 3d 568, 467 N.E.2d 624 (finding defendant's willingness to proceed to trial before the judge whom he had allegedly sought to have substituted constituted waiver of the issue on review).

Defendant, relying upon *dicta* in *People v. Flanagan* (1990), 201 Ill. App. 3d 1071, 559 N.E.2d 1105, *appeal denied* (1990), 135 Ill. 2d 561, 564 N.E.2d 842, maintains that compliance with the formal requisites of the substitution of judges provision in the Code of Criminal Procedure is jurisdictional in nature. Any noncompliance with the letter of the section, no matter how slight, divests the circuit court of its power to try the case. He concludes accordingly that a party can never waive the question of whether the court erred in granting a faulty motion to substitute judges.

However, although defendant's reading of the decision in *Flanagan* is a fair representation of the holding in that case, we nevertheless affirm the trial court because we decline to follow that decision. In *Flanagan*, as a prologue to its finding that the State had fully complied with section 114—5(c), the court gratuitously noted:

"The defendant did not assert [his contention that the State's motion for substitution of judges was untimely] in the circuit court. For this reason, the doctrine of waiver would ordinarily bar review of this contention on appeal. In this action, however, appellate review is not barred because this contention implicates a jurisdictional defect." *(Flanagan,* 201 Ill. App. 3d at 1079, 559 N.E.2d at 1110.)

But, not only did *Flanagan* fail to address our supreme court's decision in *Hicks,* which indicated that waiver was possible and appropriate in the context of procedurally infirm motions for substitution of judges, the decision made no effort to distinguish or reconcile this court's holding in *People v. Robinson* (1974), 18 Ill. App. 3d 804, 310 N.E.2d 652, which expressly found that an erroneous ruling on whether to allow a substitution of judges was not a jurisdictional defect. Instead, *Flanagan* based its *dicta* on a misapprehension of the rule set forth in *People v. Samples* (1982), 107 Ill. App. 3d 523, 437 N.E.2d 1232.

In *Samples,* the court properly held that the wrongful denial of a defendant's timely motion for a substitution of judges would render all of its subsequent rulings void. The court reasoned that because this right is absolute, once an appropriate motion is brought, the trial judge to whom it is tendered loses all power and authority over the case except that necessary to effectuate the transfer. However, we do not consider it a necessary corollary to that rule that where the court *grants* the State's motion in error, the succeeding judge attains no jurisdiction, for, as the State points out, a defendant has no indefeasible right to have his case tried before a particular judge. Accordingly, the rule of *Samples,* which was fully dependent on the fact that the court was acting after having deprived the defendant of a right which was unquestionably his, does not apply in the converse situation where the court grants the substitution. Therefore, the circuit court's conviction of defendant and the sentence it imposed need not be reversed for an alleged lack of jurisdiction.

## II

Defendant next contends that the trial court deprived him of a fair trial by improperly considering the testimony of the police officers that they had previously arrested defendant on multiple occasions for suspected trafficking in narcotics. Recently in *People v. Thingvold* (1991), 145 Ill. 2d 441, 584 N.E.2d 89, our supreme court reiterated the long-held rule of Illinois evidentiary jurisprudence that evidence of crimes committed by a defendant unrelated to the one for which he is on trial is inadmissible if offered solely to give

rise to the inference that he has a propensity to commit crimes. The court explained that such evidence had the likely potential of blinding the jury from the real evidence before it, and to convict the defendant only because it perceived him to be "a bad person deserving punishment." *Thingvold*, 145 Ill. 2d at 452, 584 N.E.2d at 93.

However, when relevant to show something other than merely the defendant's criminal bent, other crimes evidence is admissible. (*E.g., People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612.) For instance, the evidence may be used to establish, *inter alia*, the defendant's motive, identity, or absence of mistake. (*E.g., People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) The decision to admit the other crimes evidence is left to the sound discretion of the trial court, the exercise of which may not be interfered with, absent a clear showing of abuse. *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596, *appeal denied* (1990), 133 Ill. 2d 568, 561 N.E.2d 703.

■ In the case at bar, as an element of the offense for which defendant was charged, the State was obligated to prove beyond a reasonable doubt that he "knowingly *** possess[ed] with intent to *** deliver, a controlled *** substance." (Ill. Rev. Stat. 1989, ch. 56¹/₂, par. 1401.) We have held, as one of the many exceptions to the rule prohibiting the introduction of other crimes evidence, that the State may circumstantially prove both the knowledge and intent elements of this offense by establishing that the defendant has had past narcotics-related encounters with law enforcement officials. (*People v. Batinich* (1990), 196 Ill. App. 3d 1078, 554 N.E.2d 613 (holding that the substance of the defendant's earlier drug transaction with a police agent was relevant and probative of his knowledge that he possessed illegal narcotics on day of arrest); *People v. Mitchell* (1984), 129 Ill. App. 3d 189, 472 N.E.2d 114 (concluding that the substance of drug-related conversations between the defendant and an undercover agent was properly admitted, *inter alia*, "to show defendant's guilty knowledge of cocaine sales").) Defendant's alleged prior drug sales, being highly probative of whether he knew that he had carried the cocaine on the occasion at issue and whether he did so with intent to deliver, were essential aspects of the State's case against him, and therefore their admission was not error.

### III

Defendant next urges reversal and remandment for a new trial because he was denied effective assistance of counsel. His counsel allegedly abdicated his role as defendant's advocate when he did not object to the other crimes evidence discussed above and by not putting before the court certain witnesses who would support his mother's testimony with regard to the accessibility of the trunk of her auto.

In *People v. Caballero* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089, our supreme court explained that a determination of effective assistance consists of two separate inquiries. To put forth a cognizable inadequate representation claim, defendant must prove:

"(1) that his counsel made errors so serious, and his performance was so deficient, that he was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment to the United States Constitution, and (2) that these deficiencies so prejudiced the defendant as to deprive him of a fair trial, a trial whose result is reliable." (*Caballero*, 126 Ill. 2d at 259-60, 533 N.E.2d at 1091, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.)

With regard to the first prong, defendant fails to satisfy his burden unless the record reflects that his attorney did not render " 'reasonably effective assistance' " based on a standard of "objective reasonableness, under 'prevailing professional norms,' " and in so doing defendant must overcome the "strong presumption that the challenged action or lack of action might be the product of 'sound trial strategy.' " *Caballero*, 126 Ill. 2d at 260, 533 N.E.2d at 1091, quoting *Strickland*, 466 U.S. at 687-89, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-65.

A defendant establishes actual prejudice under the second aspect of *Strickland* by convincing that a reasonable probability exists that had counsel not erred, the trier of fact would not have found him guilty beyond a reasonable doubt. (*Caballero*, 126 Ill. 2d at 260, 533 N.E.2d at 1092, citing *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) A reasonable probability is one that is sufficient to undermine confidence in the outcome of defendant's trial after considering the evidence presented to the jury in its totality. (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) A reviewing court must be constantly mindful that it is to give great deference to performance of counsel and resist the temptation to second-guess a particular decision or omission. *Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.

■ We find the first of defendant's contentions to be baseless in light of the fact that with the exception of one question, his counsel objected to the other crimes evidence each time the State tried to draw such testimony from its witnesses. The second complaint, however, warrants closer scrutiny. Defendant centers this contention on the several available, yet uncalled, witnesses who would support his mother's testimony attesting to the fact that the trunk of the auto from which he purportedly withdrew a quantity of cocaine could not be opened with a key. Her testimony was offered by defendant to

contradict the testimony of the arresting officers that he gained access to the cocaine by opening the trunk with a key. He reasons that those corroborative witnesses would assist in the subversion of the State's witnesses, and that corroboration was particularly vital in the instant case in view of the obvious bias of defendant's mother toward her son.

In *Strickland*, the Court recognized that in the interests of judicial economy, many ineffective assistance claims may be more efficiently resolved by collapsing the two-tiered analysis, and determining, at the start, whether the alleged incompetence resulted in any actual prejudice against defendant. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; accord *People v. Barnard* (1984), 104 Ill. 2d 218, 238, 470 N.E.2d 1005, 1013.) Here, even assuming that all of the corroborative witnesses testified in his favor, defendant would nonetheless be unable to bear his burden of establishing that this evidence would create "a probability sufficient to undermine confidence in the outcome," nor does he even try to explain why, in the absence of his counsel's omission, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 694-95, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

The overlooked evidence complained of went only to dispute a fact which was tangential to the State's case: how defendant opened the trunk of his mother's auto, which was where he stored his cocaine prior to its resale. If the court believed, based on all of defendant's evidence, that the trunk was truly inaccessible from the back, but had to be opened via a latch in the glove compartment, it would not be compelled to conclude, *a priori*, that it must disregard all of the State's witnesses who testified that he opened the trunk with a key. The misperception as to how he opened the trunk is not so grave an error as to fully discredit the otherwise consistent and corroborative testimony of the witnesses on matters of true import in the case, *i.e.*, the trunk was indeed open, and that it was defendant who withdrew from the trunk the quantity of cocaine which the police later confiscated. In the case at bar, we are not presented with a situation where defense counsel neglected to exploit an opportunity to debase fully the testimony of the State's key witness as to her ability to identify the defendant (see *People v. Garza* (1989), 180 Ill. App. 3d 263, 535 N.E.2d 968 (finding that a defendant on trial for murder was given ineffective legal representation where counsel failed to pursue inconsistencies in the descriptions of the murderer provided by the State's sole eyewitness), *appeal denied* (1989), 127 Ill. 2d 626, 545 N.E.2d 119; *People v. Butcher* (1992), 240 Ill. App. 3d 507, 608 N.E.2d 496 (finding a violation of *Strickland* where, in a closely balanced

case, counsel failed to call two witnesses who would corroborate the testimony of defendant's sole witness who had averred that the actual perpetrators were olive-complected men with black hair and who were of Hispanic ethnicity, while the defendant was a Caucasian with light brown hair and a fair complexion)), or to offer a witness who would negate the State's entire proof as to an essential element of the offense. (See *People v. O'Banner* (1991), 215 Ill. App. 3d 778, 575 N.E.2d 1261 (determining that counsel was prejudicially incompetent at the defendant's trial for the murder of her husband in failing to call the defendant's son who had previously offered to inculpate himself for the murder of his father, which testimony would have tainted the State's evidence which tended to prove that it was the defendant who fired the murder weapon).) Accordingly, since the supposed incompetently omitted evidence in the instant case would neither have proved dispositive of defendant's innocence if offered, nor would it have even tended to undermine appreciably the essence of the State's case, defendant suffered no prejudice from its omission. Therefore, he was not denied meaningful representation of counsel.

## IV

Defendant next contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt. When reviewing the determinations of the fact finder in a criminal prosecution, we must employ a most deferential standard. Our supreme court has provided the following as a guide to our review of claims of insufficient evidence:

"[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] The reviewing courts apply this standard regardless of whether evidence is direct or circumstantial. [Citations.] This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' [Citation.] Therefore, [the reviewing] court will not reverse a criminal conviction unless the evidence is so 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation].' [Citation.]" *People v. Sutherland* (1992), 155 Ill. 2d 1, 17, 610 N.E.2d 1, 8.

■ Viewing the evidence in a light most favorable to the State, we find that it presented three separate witnesses who consistently testified that they observed defendant in possession and control of a bag which contained nearly half a kilogram of cocaine. That large amount of cocaine created a presumption that defendant possessed

the controlled substance with an intent to deliver it to another. (*People v. Munoz* (1982), 103 Ill. App. 3d 1080, 432 N.E.2d 370.) Finally, defendant's earlier encounters with the police for suspected drug trafficking could have been viewed by the fact finder as establishing that he possessed the cocaine with the criminal knowledge of what it was.

Moreover, the court found defendant's explanation of his actions on the evening of his offense absurd. It questioned why codefendant would seek defendant's evaluation of the narcotics she had stolen when there was nothing in the record to suggest why she would believe him to have any expertise in the area. He had disavowed any knowledge of drugs, testifying that he had only seen cocaine on television. Too, the court found such obvious biases in defendant's witnesses, who were his girl friend, a long-time friend, and his mother, that it discounted their corroborative testimony accordingly.

Defendant ties his argument on appeal to inconsistencies in the testimony of the State's witnesses. However, minor discrepancies by the State's witnesses in their relation of events of a crime do not, in and of themselves, render their testimony as a whole so improbable that it must be disregarded on review. (*People v. Adams* (1985), 109 Ill. 2d 102, 485 N.E.2d 339.) As discussed above, the alleged discrepancies in the officer's testimony did not disturb the heart of the State's proof of defendant's guilt. Consequently, in the case at bar, there was ample evidence of defendant's guilt presented to the trier of fact to sustain defendant's conviction.

### V

In defendant's final assignment of error, he prays for a reduction of his term of incarceration from its present 14 years to the statutory minimum of 12 years. Our supreme court has held consistently that the imposition of sentence is within the trial court's discretion and that a sentence imposed will not be altered by a reviewing court unless the trial court abused its discretion. (*E.g., People v. Ashford* (1988), 121 Ill. 2d 55, 88, 520 N.E.2d 332, 346; *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883; *People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330.) A sentencing court's decision is cloaked with a presumption of correctness. (*People v. Choate* (1979), 71 Ill. App. 3d 267, 275-76, 389 N.E.2d 670, 676.) This court must be particularly hesitant to interfere with a sentence which is within the statutorily prescribed range. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

Defendant was convicted of violating section 401 of the Illinois

Controlled Substances Act (Ill. Rev. Stat. 1989, ch. 56$^{1}$/$_{2}$, par. 1401), an offense which carries with it a mandatory term of incarceration of at least 12 years to a maximum of 50 years. He contends that his punishment, which is only two years longer than the minimum allowable, is excessive. He argues that the court considered incompetent evidence in reaching its sentencing determination and must therefore be reversed.

■ However, when determining the proper sentence, the circuit court is not bound to consider only evidence which would be admissible against an accused in the guilt phase of the trial. (*People v. Adkins* (1968), 41 Ill. 2d 297, 242 N.E.2d 258; *People v. Marchell* (1991), 215 Ill. App. 3d 404, 574 N.E.2d 1267.) The Unified Code of Corrections makes clear that, while passing sentence, the court is to reflect upon all reliable evidence tending to show defendant's relative culpability, as well as his potential for rehabilitation. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—4—1.) Here, the court found from the evidence before it that defendant was not a novitiate in drug trafficking, but had set up a sophisticated delivery system. (*People v. Griffiths* (1983), 112 Ill. App. 3d 322, 445 N.E.2d 521 (finding no error in the sentencing court's consideration of the defendant's prior criminal activities for which he was not convicted so long as the evidence was reliable and subject to cross-examination).) This conclusion had a basis in the evidence before the court, and may constitute a factor in aggravation, warranting a sentence in excess of the statutory minimum 12 years. (See *People v. Allen* (1983), 119 Ill. App. 3d 845, 457 N.E.2d 77 (holding that a trial court may consider an aggravating factor even though it is not expressly provided in section 5—5—3.2); see also *People v. Robinson* (1991), 221 Ill. App. 3d 1045, 582 N.E.2d 1299 (holding that among the factors a sentencing court can consider is the threat posed to society by the defendant's crimes).) Furthermore, the court was informed that defendant had been adjudged delinquent as a juvenile, which is another pertinent factor to be considered in aggravation. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(3); *People v. Powell* (1973), 53 Ill. 2d 465, 292 N.E.2d 409.) Therefore, it was not an abuse of the court's discretion to sentence defendant to 14 years in the custody of the Illinois Department of Corrections.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

McCORMICK, P.J., and DiVITO, J., concur.