FIFTH DIVISION

 June 28, 2002

Nos. 1-99-0846 & 1-99-4197

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

ROSE NOLAN and ACQUINETTA POWELL,

Defendants-Appellants.

))))) ))))

)

Appeal from the

Circuit Court of

Cook County

Honorable

Robert Bertucci,

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

From April 1994 until November 1994, the Cook County State's Attorney's office, in conjunction with the Cook County sheriff's department, conducted a drug operation investigation known as "Operation Hollywood."  The investigation led to the indictments of six individuals, Rose Nolan, Acquinetta Powell, Paul Campbell, Phyllis Odum, Ester Tanner and Marshall Collier, on counts of criminal drug conspiracy and possession of a controlled substance with intent to deliver.  Following separate jury trials, defendant Nolan was found guilty of criminal drug conspiracy and was sentenced to 19 years' imprisonment; defendant Powell was found guilty of criminal drug conspiracy and was sentenced to 12 years' imprisonment.

On appeal, defendant Nolan argues that: (1) the trial court erred in summarily granting the State's motion for substitution of judge; (2) she was deprived of a fair trial where the trial court informed the jury that she had a prior conviction; (3) she was deprived of a fair trial where the trial court allowed the introduction of evidence that codefendant Campbell had been carrying a gun; and (4) she must be resentenced where the trial court erroneously believed that a minimum sentence existed for the offense of criminal drug conspiracy.

On appeal, defendant Powell argues that: (1) the trial court erred in summarily granting the State's motion for substitution of judge; (2) the trial court erred in failing to suppress defendant's statements; and (3) she was not proven guilty beyond a reasonable doubt.

For the following reasons, we affirm the convictions and sentences of both defendants. 

I.  BACKGROUND

A.  State's Case 

Kenneth Maicke, an investigator for the Cook County State's Attorney's office, testified that he supervised the "Operation Hollywood" narcotics investigation on the south side of Chicago.  As part of the surveillance utilized in the operation, court- ordered wiretaps were installed and monitored on various phone lines.

Alan Nakayama testified that he was the senior supervisor in the narcotics section of the Cook County State's Attorney's office.  Nakayama testified that he supervised the State's Attorney's "wire room," where the phone calls were monitored during the investigation.  He testified as to the chain of custody of various tapes and logs made in this surveillance.  During the trial, the State presented 122 tapes of recorded conversations.  

Paul Fellner, an Ameritech Corporate Security manager, identified the customer service records for Paul Campbell, defendant Nolan's husband.  The records were made in the usual course of business and dealt with two specified phone numbers.  The addresses listed for the phones were 12747 South Parnell and 11439 South Union.  He identified defendant Powell's customer service records for a phone line which had been disconnected.  He also identified the customer service records for two other specified phones.

Margaret Priester, a Cellular One employee, identified a specified phone number as being registered to defendant Powell.

Maurice Macklin testified that he was an investigator for the Cook County State's Attorney's office and was involved in "Operation Hollywood."  Macklin was the undercover officer involved in the price negotiation and purchases of cocaine with the various parties involved.    

Macklin testified that on April 25, 1994, at approximately 1 p.m., he went to the residence of Phyllis Odum at 11520 South Aberdeen.  Macklin inquired into the cost to purchase two ounces of cocaine.  Odum made a phone call and then told Macklin it would cost $2,100.  Macklin told her he would need it the next day.  On April 26
, Macklin arrived at Odum's.  Macklin saw Paul Campbell in Odum's kitchen.  Campbell then left and returned 15 minutes later.  Odum left the kitchen and returned carrying two clear bags of suspect cocaine.  Odum told Macklin that Campbell was "the man," meaning that he was the source of the cocaine.  Macklin paid her $2,100 for the purchase.  After a positive field test, Macklin inventoried the drugs as evidence.

On May 5, 1994, Macklin called Odum and said he needed two ounces of cocaine.  After the call, investigators surveying 12747 South Parnell, the residence of Paul Campbell and defendant Nolan, saw Campbell leave the house.  Macklin arrived at Odum's and discussed the price.  Campbell then arrived at Odum's and pulled a white envelope from his sleeve and handed it to Odum.  Odum showed Macklin the opened envelope which contained two clear bags of suspect cocaine.  After Macklin paid Odum $2,100, she took the money to Campbell.  Campbell yelled out from a back bedroom that the money was straight and Macklin left.  The field test performed on the purchase was positive for cocaine.  The cocaine was then inventoried.

On June 8, 1994, Macklin called Odum and told her he was "coming through."  While at Odum's, Macklin inquired as to the cost of a quarter kilo of cocaine.  After making and receiving a phone call, Odum told Macklin the price would be $7,600.  Macklin left, telling Odum he would contact her later.  On June 9
, Macklin talked to Campbell by phone and they agreed to a purchase to take place later that day at Odum's.  Surveillance at the residence of Campbell and Nolan saw Campbell leave and he arrived at Odum's three minutes later.  Campbell had a black bag which contained a brown-packaged, quarter kilo of suspect cocaine.  Macklin took the package and gave Campbell the money.  Campbell told Macklin to deal directly with him from that point and gave him a number where he could be reached.  The package tested positive in a field test for cocaine.  

On October 18, 1994, Macklin called Campbell and they met.  Campbell
 and Macklin discussed future purchases and prices.  Campbell sold Macklin an ounce of suspect cocaine for $850.  Surveillance videotaped the meeting and the tape was shown to the jury.

Campbell and defendant Nolan subsequently moved residences and were now living at 11439 South Union. Surveillance was subsequently set up at that address on November 2, 1994.  Wiretaps were approved on two phone lines at that address.

On November 7, 1994, Macklin again called Campbell's number to purchase a quarter kilo of cocaine.  He spoke with defendant Nolan and Tanner about the purchase.  Four minutes later, defendant Nolan called defendant Powell and asked if she had a quarter "key" available.  Powell replied that she did.  Macklin called Nolan back and she told him that the quarter kilo would cost "7 bills" and to call her when he was close to the city.  Campbell called Nolan minutes later and she informed him of the order, expressing some fear about Macklin.  She said he was "too anxious."  Campbell told Nolan not to worry.  Several phone calls took place during the next few hours between Campbell, Nolan and Powell.  They discussed the price, quality and delivery of the drugs.  Macklin contacted Campbell and it was decided that the two would meet at the McDonald's on 114th
 Street.  Macklin told Campbell he wanted to do a "half and half" transaction where he would tender half the money now and the other half after Campbell returned with the drugs.  Campbell called defendant Nolan to inform her of the plan.  Defendant Nolan then called defendant Powell to inform her of the plan.

At approximately 8:45 that evening, Macklin arrived in the McDonald's parking lot and called Campbell.  A few minutes later Campbell pulled in the lot and Macklin got into his car.  Macklin gave Campbell $3,500 as agreed.  Macklin exited the car and Campbell pulled out of the parking lot.  Campbell met defendant Powell at a shopping center on 107th
 Street, where he picked up the drugs.  Campbell returned to the McDonald's parking lot at 9:25 p.m. and backed into the parking space.  As Macklin approached the car, Campbell noticed two surveillance officers.  Officers O'Reilly and Kaysen ordered Campbell out of the car, handcuffed both Campbell and Macklin, seized a box which contained a quarter kilo of suspect cocaine from the car, and a .380 handgun from Campbell's right side pocket.  The officers then, in an attempt to appear crooked, uncuffed both men and told them to be on their way.  The substance field tested positive for cocaine.  Campbell subsequently called defendant Nolan and told her he had been "set-up like a mother------."  Nolan then called defendant Powell to check the money she had received.  Powell informed her the money was "straight." 

On February 22, 1995, defendant Nolan and Phyllis Odum were arrested.  Nolan was taken to the 5th
 District police station, where Macklin processed her arrest.  David O'Connor, an assistant State's Attorney, testified that he interviewed defendant Nolan after 10 p.m. on February 22nd
.  After reading Nolan her 
Miranda
 rights, Nolan agreed to speak with O'Connor.  After approximately 30 minutes, O'Connor terminated the conversation because Nolan was providing information he knew to be false.  At approximately 11:30 that same night, Nolan agreed to provide a written statement.

In the statement, Nolan said that she lived at 11439 South  Union with her husband Paul Campbell, codefendant Esther Tanner, and codefendant Marshal Collier (her brother).  Nolan admitted to being involved in the distribution of cocaine since 1990.  She stated that she had attempted to obtain multiple kilos for the Gangster Disciples in the past but had failed.  Nolan stated that her business operated on a smaller scale, obtaining single kilos then breaking them down and selling them in smaller pieces.  Nolan admitted that people would call the house and that Campbell, Collier or Tanner would make deliveries to local restaurant parking lots.  Nolan admitted to selling approximately 10 ounces of cocaine a week.  Nolan also admitted that she and Campbell had been involved in the delivery of nine ounces of cocaine in November of the past year but that the police had robbed Paul.  Nolan declined to reveal the names of her sources.  Every page of the statement was reviewed and initialed by Nolan and O'Connor.

On March 20, 1995, defendant Powell was arrested.  Clarence Travis, an investigator for the Cook County State's Attorney's office, arrested Powell and was present during her interrogation.  Assistant State's Attorney (ASA) David O'Connor, who was also present, read Powell her 
Miranda
 rights.  Powell agreed to speak with ASA O'Connor and Travis, and the interview lasted approximately 1 hour and 40 minutes.  Prior to any questioning, Powell told ASA O'Connor that she knew what she did was illegal but she did not go around selling dope to everyone.  Powell admitted her involvement in the 250-gram negotiation and sale with Campbell and Nolan from November 7, 1994.  Powell admitted that she was the supplier for the 250 grams of cocaine.  Powell admitted that she purchased the cocaine for $5,000, that it was going to be sold for $7,000, and that her cut would be $1,500.  Powell admitted that her friends called her "Shelly" or "Michelle," which was her middle name.  Powell was not willing to divulge the names of her suppliers.  During the interview, O'Connor played a tape recording of a phone conversation from November 7, 1994.  Powell admitted that it was her voice on the tape.  Powell then requested a lawyer and questioning ceased.  Powell refused to have her previous admissions memorialized. 

Travis also identified Powell's voice from the tape-recorded phone conversations.  He testified that her voice was unique, and four months after hearing the recordings, upon her arrest, he believed it was her voice he heard.  He also testified that the night she was arrested was the only time he heard Powell speak and that neither he nor any member of the investigation ever saw Powell.  

1.  
Wiretaps

A dial number recorder (DNR) was installed on all of the phones involved in this investigation.  The DNR is an electronic device that monitors targeted telephone activity, including number, date, time and duration of incoming calls and outgoing calls. Word-for-word transcripts of the monitored phone conversations were transcribed and provided in the court's supplemental record.  In addition, without reiterating the contents of each conversation that occurred, the State's brief, on pages 15 to 38, outlines each drug transaction that occurred between November 1
 and November 10
.   The transactions involve various parties calling the Campbell/Nolan residence ordering various quantities of cocaine.  The wiretaps also recorded the outgoing phone calls of Tanner, Nolan and Campbell. 

2.  
Surveillance

In addition to the wiretaps, the Cook County State's Attorney's office and sheriff's department set up surveillance at various locations in this case.  These locations included Nolan's residence on Parnell, Nolan's residence on Union, the McDonalds' on 114
th
 Street
 and Halsted Street, the Shell Station at 115
th
 Street
 and Halsted Street, the Amoco Station at 103rd
 Street and Halsted Avenue, and the Amoco Station at 701 E. 111
.  The surveillance documented the activities of the parties that occurred at these locations.

B.  Defense Case 

After the State rested, defendant Nolan moved for a directed verdict, which was denied. Defendant Nolan did not testify based, as asserted in her brief, on the trial court's ruling denying defendant's motion to preclude the introduction of her 1992 conviction of possession of a controlled substance. Defense counsel indicated the desire to call Ms. Bray, a former assistant State's Attorney originally involved in the case, but she could not be located and defense counsel chose not to make a proffer as to what she would have testified.  Defendant Nolan rested.  Defendant Powell did not testify at trial either.  Defendant Powell, in her case in chief, recalled Investigator Travis, who testified that no police reports or arrest reports that he reviewed ever mentioned a middle initial, M. or S., an alias, or any reference to Michelle or Shelly.

Both defendant Nolan and defendant Powell were found guilty of criminal drug conspiracy.  The judge sentenced defendant Nolan to 19 years' imprisonment and defendant Powell to 12 years' imprisonment.  Both defendants' now timely appeal.

II.  ANALYSIS

A.  Defendant Nolan

1.  
Substitution of Judge

Defendant first argues that the trial court erred in granting the State's motion for substitution of judge over the defendant's objection.  Specifically, defendant maintains that the trial court to which this case was initially assigned mistakenly believed that it had no choice but to grant the motion and failed to realize its authority to inquire into the actual grounds for the motion.  Defendant argues that because the State's motion was prompted by the court's willingness to entertain a defense motion for a bond reduction, the motion should not have been granted.

The applicable statute in this case states: 

"(c) Within 10 days after a cause has been placed on the trial call of a judge the State may move the court in writing for a substitution of judge on the ground that such judge is prejudiced against the State.  Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion.  The State may name only one judge as prejudiced, pursuant to this subsection."  725 ILCS 5/114-5(c)(West 1996). 

Defendant's case was originally assigned to Judge Singer.  Defendant moved for a substitution of judge, which was granted, and the case was assigned to Judge Himel.  On the date the case was put on Judge Himel's call, April 10, the case was continued by agreement of the parties for eight days.  On April 10
, Judge Himel indicated that he would consider defendant's motion for a bond hearing on April 18. The State filed the motion for substitution of judge on April 18
.  In response, Judge Himel stated "the law is clear.  I think both sides have a right automatically within ten days to substitution of judge."

Clearly the motion, made eight days after the case was placed on Judge Himel's call, was timely.  The thrust of defendant's argument is that the trial court was obligated to "conduct a thorough inquiry into the State's motivation" for filing the motion, regardless of whether the motion was timely filed.  This assertion is directly contrary to Illinois law.  As section 114-5(a) of the Code of Criminal Procedure of 1963 (Code)(725 ILCS 5/114-5(a)(West 1994)) allows the defendant to move the court seeking a substitution of judge, section 114-5(c) allows the State to make a motion for substitution of judge as well.  

Our supreme court first addressed section 114-5(c) in 
People v. Williams
, 124 Ill. 2d 300 (1988).  The court first held that section 114-5(c) did not interfere with Supreme Court Rule 21(b) (134 Ill. 2d R. 21(b) Rule 21(b) states:

"(b) General Orders.  The chief judge of each circuit may enter general orders in the exercise of his general administrative authority, including orders providing for assignment of judges, general or specialized divisions, and times and places of holding court."  134 Ill. 2d R. 21(b). 

The court held: "Similar to section 114-5(a) [giving the defendant a statutory right to substitution of judge], section 114-5(c) may be utilized only 
after
 assignment of the case to a particular judge.  Consequently, we hold that section 114-5(c) does not conflict with Rule 21(b)." (Emphasis in original.)  
People v. Williams
, 124 Ill. 2d at 307.  The court further held that "section 114-5(c) does not violate separation of powers principles by impermissibly infringing on the role of the judiciary."  
People v. Williams
, 124 Ill. 2d at 307.

The court then addressed whether section 114-5(c) comports with due process:

"When it exercises its right to a substitution of judge under section 114-5(c), the State is not seeking a particular judge, only an impartial one.  Conversely, the defendant has no due process right to defeat this substitution motion, because he too has only the right of impartiality.  If the State moves for a substitution of judge, and the defendant feels that the substituted judge could not be impartial towards him, he can always make his own motion to substitute under section 114-5(a) or for cause under section 114-5(d).  Accordingly, we find no merit in defendant's denial-of-due-process argument."  
People v. Williams
, 124 Ill. 2d at 309.

The provisions of the Code providing for the substitution of judge are to be construed liberally to promote rather than defeat substitution.  
People v. McDuffee
, 187 Ill. 2d 481, 488 (1999).

Defendant asserts that the decision in 
People ex rel. Baricevic v. Wharton
, 136 Ill. 2d 423 (1990), requires the trial court to conduct a 
Batson
-like procedure in order to review the State's use of substitution of judge motions.  
Batson v. Kentucky
, 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712 (1986).  We disagree.  In 
Wharton
, the State's Attorney filed six timely motions for substitution of judge as of right, pursuant to section 114-5(c), before Judge Wharton.  The record revealed that the State's Attorney had admitted that, prior to filing the motions, he had asked the chief judge to reassign Judge Wharton.  A memorandum was presented which contained the State's Attorney's statement of intent to continue filing the substitution motions if Judge Wharton was not reassigned.  The trial judge denied the State's motions, finding that the State was using the motions to encourage the chief judge to remove him from the felony docket.  Our supreme court first noted that "section 114-5(c) does not constitute an impermissible legislative infringement on the judiciary in violation of the separation of powers doctrine."  
Wharton
, 136 Ill. 2d at 434.  However, "[i]n response to the possibility that section 114-5(c) may be used by the State for unconstitutional purposes, we similarly find it necessary to adopt a procedure to be used in assessing a State's use of section 114-5(c) motions where it appears that such motions are being used to thwart the chief judge of a circuit court's exercise of independent assignment authority."  
Wharton
, 136 Ill. 2d at 437.  

The supreme court held that the State's Attorney's "blanket use" of substitution of judge motions in all felony proceedings before a particular judge, when viewed in conjunction with the State's Attorney's earlier attempts to have that particular judge reassigned, posed a threat to "the dignity and independence of the judiciary."  
Wharton
, 136 Ill. 2d at 435.  The court said that the right to a substitution of judge provided by section 114-5(c) is similar to the State's right to peremptorily challenge venirepersons.  See 725 ILCS 5/115-4(e)(West 1994).  "[I]n both instances, the basis for removing the person involved (either the judge's prejudice or the venireperson's perceived shortcomings) generally is not subject to judicial scrutiny."  
Wharton
, 136 Ill. 2d at 436.  The court found there is one exception to this rule prohibiting inquiries into the basis for the State's action in filing a substitution motion- "where it appears that such motions are being used to thwart the chief judge of a circuit court's exercise of independent assignment authority."  
Wharton
, 136 Ill. 2d at 437.  The court went on to establish a procedure for reviewing whether the State's use of substitution motions violates the separation of powers doctrine.  

"First, the trial judge must determine whether there is 
prima facie
 evidence that the motions are being used in an effort to thwart the chief judge of the circuit court's independence in assigning cases to the judges in his circuit.
  Among the factors that may be considered in making a 
prima facie
 determination are whether the State's Attorney's office has used, and indicates that it plans to continue using, section 114-5(c) motions on a blanket basis in almost every case assigned to the judge; whether the State's Attorney's office has made other attempts besides use of section 114-5(c) motions to have the judge reassigned (such as directly contacting the chief judge and requesting reassignment); whether members of the State's Attorney's office have made statements reflecting a desire that the judge be reassigned; and any other evidence that indicates that the section 114-5(c) motions are being used for the purpose of influencing the chief judge in his assignment decisions.  

If the trial judge determines that a 
prima facie
 case does not exist, the section 114-5(c) motion must be granted. If a 
prima
 
facie
 case is found to exist, a hearing shall be conducted as soon as possible before a judge other than the judge named in the motion. (See Ill. Rev. Stat. 1987, ch. 38, par. 114-5(d).)"  
Wharton
, 136 Ill. 2d at 438-39.

The record in this case is bereft of any allegation or proof that the State has used and indicated that it plans to continue to use section 114-5(c) motions on a blanket basis in almost every case assigned to Judge Himel.  Nor is there any allegation or proof that the State's Attorney's office has made other attempts to have Judge Himel reassigned or that members of that office have made statements reflecting a desire that the judge be reassigned.  Nor is there any allegation or proof that the State was using section 114-5(c) motions for the purpose of influencing the chief judge in his assignment decisions.  In the absence of these factors, the holding in 
Wharton
 required the trial court to grant the section 114-5(c) motion.

The court in 
Wharton
 stated that the procedure for reviewing substitution motions was implicitly set forth in that court's decisions which permit the trial court to inquire into the basis of the allegations of prejudice when there is 
prima facie
 evidence that the substitution of judge motion was filed merely to delay or avoid trial.  
Wharton
, 136 Ill. 2d at 438, citing 
Hoffman v. Hoffman
, 40 Ill. 2d 344, 348 (1968).  If there is such 
prima facie
 evidence, "[t]he movant then has the burden of substantiating his allegations of prejudice. [Citation.] If, however, there is no evidence that the purpose of the motion was to cause delay, the trial judge cannot inquire into the good faith of the allegations of prejudice."  
Wharton
, 136 Ill. 2d at 438.  Similarly, we hold that unless the trial court makes a finding that there is 
prima facie
 evidence that substitution motions are being used in an effort to thwart the chief judge of the circuit court's independence in assigning cases to the judges in his circuit, the trial judge cannot inquire into the good faith of the allegations of prejudice in a section 114-5(c) motion.

This decision is supported by other cases which have reviewed the holding in 
Wharton
.  "If [the section 114-5(c)] motion is timely and in proper form, the State, like the accused, is vested with an absolute right to a change in venue."  
People v. Marshall
, 256 Ill. App. 3d 310, 316 (1993), citing 
Wharton
, 136 Ill. 2d at 430.  "We interpret 
Wharton
 to mean that the burden is on the defendant to at least allege facts which, if true, would require the judge to conduct a hearing.  We do not interpret 
Wharton
 to mean that when a motion for substitution of a judge is made by the State, the judge must 
sua sponte
 announce the presence or absence of a 
prima facie
 case of abuse."  
People v. Ross
, 244 Ill. App. 3d 868, 878 (1993).  The language of section 114-5(c) also clearly prohibits trial courts from inquiring into the State's basis for filing a motion for substitution of judge.  "Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion."  725 ILCS 5/114-5(c) (West 1994).

As to defendant's argument that the State filed its  substitution motion because Judge Himel indicated that he would hear a motion to reduce bond for the defendants on April 18, this fact, even if true, is inconsequential.  In 
In re A.N.
, 324 Ill. App. 3d 510 (2001), the appellate court reversed a trial court's denial of the State's motion for substitution of judge.  After denying the State's motion for substitution, the trial court denied the State's motion pursuant to section 5-805(3)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/5-805(3)(a) (West 2000)) for discretionary transfer of jurisdiction from the juvenile court for trial as an adult.  This denial of the transfer order was appealable pursuant to Rule 604(a)(1) (188 Ill. 2d R. 604(a)(1)).  The appellate court held that the trial court's ruling on the State's motion for substitution was reviewable because it bore directly upon whether the trial court's order denying the transfer was proper.  Prior to the State's motion for substitution of the judge, the trial judge held a hearing on the State's petition for temporary detention.  The appellate court held that such a hearing was not a substantial ruling precluding an automatic substitution of judge.  
In re A.N.
, 324 Ill. App. 3d at 513.  Judge Himel's indication that he intended to hear a motion to reduce bond is obviously not a substantial ruling which would preclude the State from exercising its right to automatic substitution of judge.

Defendant has not alleged, at trial, nor on review, that the prosecution was systematically using substitution motions to hinder the chief judge in the circuit court of Cook County in assigning cases to Judge Himel.  
For these reasons, we hold that the trial court properly granted the State's motion for substitution of judge without inquiring into the basis for that motion.

2.  
Instruction regarding prior conviction
  

Defendant Nolan next argues that she was deprived of her right to a fair trial where the trial court informed the jury that she had a prior conviction.  Specifically, defendant takes issue with the following comment made by the trial judge while reading the jury instructions:

    "It is proper for an attorney to interview or attempt to interview a witness for the purpose of learning the testimony the witness will give.

    However, the law does not require a witness to speak to any attorney before testifying.

    Evidence of a defendant's previous conviction- that is not an instruction. Disregard that ladies and gentlemen."

The State argues that defendant has waived this issue on appeal.  A defendant must raise an objection at trial and in a written posttrial motion to properly preserve issues for review.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  Defendant failed to raise this issue in her posttrial motion.

The waiver doctrine, however, is not absolute; Supreme Court Rule 615(a) provides that plain errors affecting substantial rights may be reviewed on appeal, though not objected to at trial or in a posttrial motion.  134 Ill. 2d R. 615(a).  In criminal cases, plain error may be invoked where the evidence is closely balanced or the error was of such magnitude that the accused was deprived of a substantial right and denied a fair trial.  
People v. Armstrong
, 183 Ill. 2d 130, 151 (1998).  We choose to address this issue.

Defense counsel made a motion for mistrial stating that the comment would prejudice his client.  The trial court, in denying the motion during the exhibits conference, dealt with this issue at length.  The court stated:

"What occurred was that when we went through the instructions there was an indication that your client may testify.***Once we went through the instructions and you stated that she may testify or whatever it was you said in that regard and the record will bear it out, we kept this instruction that we would only give if she did testify***I failed to clip this one.  So it was still here.  So as I'm reading the instructions as you put it I started to read this one.  I don't know how far I got.  It's four lines.  I didn't finish the first line.***I then immediately told the jury that that was not an instruction for them.  Disregard that and I went on to the next one. So I don't think that that is something that will result in prejudice to your client."

First, the trial court's comment did not amount to informing the jury that the defendant had a prior conviction.  While it was an error for the judge to begin to read an instruction that was not warranted in this case, the partial comment did not affirmatively state "defendant Nolan has a prior conviction."  As the State noted, the trial judge simply misspoke by beginning to read a general jury instruction that was not to be given in this case.  Additionally, defendant has failed to establish any prejudice flowing from the error.  The judge immediately cured the harmless error by instructing the jury to disregard the partial comment.  Defendant has not alleged that the jury gave any weight to the comment in its finding.  We note that the jurors hearing Nolan's case knew that a separate jury was hearing Powell's case.  The fact that the judge only partially read a sentence concerning a prior conviction, stopped, and informed the jury "that is not an instruction" could lead Nolan's jury to infer that this instruction was applicable to Powell and was not applicable to Nolan
.  A trial court's finding in denying a motion for mistrial will not be reversed absent an abuse of discretion.  
People v. Wilson
, 309 Ill. App. 3d 235, 242 (1999).  The denial of a mistrial was not an abuse of discretion under these circumstances, particularly where the trial court promptly and thoroughly instructed the jury to disregard the statement
.  For these reasons, we hold that the trial court properly denied defendant's motion for a mistrial. 

3.  
Irrelevant evidence

Defendant Nolan next argues that she was deprived of a fair trial where the trial court allowed introduction of irrelevant evidence.  Specifically, defendant maintains that reversible error occurred where the trial court, over defense objection, allowed the State to introduce evidence that police found a handgun on the person of co-conspirator Paul Campbell.  

Defendant has waived this issue on appeal.  It is well settled that a defendant must raise an objection at trial and in a written posttrial motion to properly preserve issues for review.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  Defendant failed to raise this issue in her posttrial motion.  As previously discussed, the plain error doctrine may be invoked where the evidence is closely balanced or the error was of such magnitude that the accused was deprived of a substantial right and denied a fair trial.  
People v. Armstrong
, 183 Ill. 2d 130, 151 (1998).  Neither of these bases applies to this issue.

4. 
Sentencing

Finally, defendant Nolan argues that she must be resentenced where the trial court erroneously believed that the minimum sentence for criminal drug conspiracy was nine years.  Defendant maintains that where the statute provides no minimum sentence for criminal drug conspiracy, the trial court's mistaken belief warrants remanding in this case. 

Again, we note first that defendant has waived any challenge to her sentence by failing to file a postsentencing motion pursuant to section 5-8-1(c) of the Unified Code of Corrections.  730 ILCS 5/5-8-1(c) (West 1998); 
People v. Kolakowski
, 319 Ill. App. 3d 200, 217 (2001).

Even if we were to consider her claim, defendant's sentence should stand.  Section 405.1 of the Illinois Controlled Substances Act states in pertinent part:

"§ 405.1.  (a) Elements of the offense.  A person commits criminal drug conspiracy when, with the intent that an offense set forth in Section 401, Section 402, or Section 407 of this Act be committed, he agrees with another to the commission of that offense.  No person may be convicted of conspiracy to commit such an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator.

* * *

(c) Sentence.  A person convicted of criminal drug conspiracy may be fined or imprisoned or both not to exceed the maximum provided for the offense which is the object of the conspiracy." 720 ILCS 570/405.1 (West 1994).

In addressing the constitutionality of section 405.1(c), the supreme court has held, "subsection (c) plainly and unambiguously establishes a sentencing range 'simply between no penalty, at the one extreme, and, at the other, fine plus imprisonment up to the specified maxima' for the object of the conspiracy. [Citation.]"  
People v. Hickman
, 163 Ill. 2d 250, 258 (1994).  The court stated that the statute was not vague where it provided a range from zero to the provided maximum.  The court went on to state, "[w]e lastly and 
importantly
 note that a trial court, in its sound discretion, can impose a minimum sentence for criminal drug conspiracy in accordance with the minimum sentence for the crime that is the object of the conspiracy.
" (Emphasis added.) 
Hickman
, 163 Ill. 2d at 263.  

As the State correctly asserts, the object of the conspiracy in this case was delivery of a controlled substance between 100 to 400 grams.  Section 401(a)(2)(B) of the Criminal Code of 1961 (720 ILCS 570/401(a)(2)(B)(West 1994)) provides a 9-year statutory minimum and a 40-year statutory maximum for that offense.  Therefore the trial court clearly had discretion to sentence defendant to 19 years imprisonment where the sentence is within the proscribed range.  
Hickman
's holding that a trial court has the discretion to set the minimum sentence as provided for the object of the conspiracy is unequivocal, whether it appears in the first paragraph or the last.  Defendant's attempt to discount 
Hickman
's holding in her reply brief as a "penultimate paragraph" is therefore not persuasive.  

Additionally, as defendant herself pointed out, and the record certainly reveals, the trial judge delicately balanced the factors in aggravation and mitigation in this case.  Other than the bald assertion, defendant has pointed to no evidence in the record which indicates that the judge would have given a lesser sentence even if he believed that he could sentence defendant to no time in prison.  We hold that no error occurred in sentencing and therefore we affirm the sentence of the trial court.

B.  Defendant Powell

1. 
Substitution of Judge

Defendant first argues that the trial court erred in granting the State's motion for substitution of judges.  For the reasons set forth in the analysis of defendant Nolan's first issue on appeal, we hold that the trial court properly granted the State's motion for substitution of judges.

2.  
Motion to suppress

Defendant next argues that the trial court erred by failing to suppress her statements.  Defendant maintains that assistant State's Attorneys continued to question her after she requested a lawyer and, therefore, her subsequent response did not constitute a valid waiver.  Specifically, defendant asserts that she asked to speak with a lawyer when Investigator Travis first arrested her and when Assistant State's Attorney O'Connor spoke with her.

We hold that the trial court properly denied defendant's motion to suppress her statements.  In 
In re G.O.
, 191 Ill. 2d 37, 49-50 (2000), our supreme court adopted a 
de novo
 standard of review for the ultimate question of whether a confession is voluntary, but again affirmed that a reviewing court will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence.  A trial court's ruling on a motion to suppress is given great deference because the trial judge is in the best position to determine the credibility of witnesses and to resolve any conflict in their testimony. 
People v. Melock
, 149 Ill. 2d 423, 432 (1992).

In this case, the trial court examined the evidence and denied defendant's motion to suppress her statement.  The court reiterated the officers' testimony in this case which supported the State's assertion that defendant was advised of her rights, and that she chose not to invoke her right to counsel until after ASA O'Connor played a tape recording of a telephone conversation for her.  The evidence demonstrated that the questioning ceased at this point.  Because there were sufficient bases for the court's determination, we affirm the trial court's denial of defendant's motion to suppress. 

3.  
Reasonable doubt

Finally, defendant argues that she was not proven guilty beyond a reasonable doubt.  We hold that the evidence presented clearly supports defendant's conviction for criminal drug conspiracy.  

When the sufficiency of the evidence in a criminal trial is challenged on appeal, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. Collins
, 106 Ill. 2d 237, 261 (1985). Because it is not a reviewing court's function to retry a defendant, this standard of review is one of great deference to the trier of fact. 
People v. Smith
, 177 Ill. 2d 53, 73 (1997). It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences regarding basic and ultimate facts. 
People v. Howery
, 178 Ill. 2d 1, 38 (1997). A criminal conviction will not be set aside on the ground of insufficient evidence unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. 
People v. Taylor
, 186 Ill. 2d 439, 445 (1999).

On the facts presented no reasonable doubt exists as to defendant's guilt.  During trial, the prosecution presented 122 tapes of recorded conversations, 17 of which contained defendant's voice.  As illustrated by the conversations that occurred on November 7, 1994, between defendant, Rose Nolan and Paul Campbell, defendant was undoubtedly involved in the drug conspiracy.  In summary, in the recordings: (1) Nolan contacts defendant and asks if she had a quarter kilo of cocaine, to which defendant responds affirmatively; (2) defendant calls Nolan to tell her the price the cocaine would be available for; (3) Nolan called defendant to find out what form the cocaine was in; (4) Nolan called defendant several times to see if the cocaine had been delivered yet; (5) defendant called Nolan to tell her the cocaine had arrived; (6) defendant called Campbell and a delivery plan was devised; (7) Nolan called the "Minne Club" and asked for "Michelle" (defendant's middle name), defendant got on the phone and the two discussed the plan; (8) defendant called Nolan to find out what was going on, Campbell instructed her to bring the cocaine to a shopping center; and (9) defendant called Nolan to find out why Campbell failed to show up with the rest of the money, Nolan informed her they had been set up.  

These tapes attest to defendant's involvement in the conspiracy, namely her "agree[ment] with another to the commission of that offense" as provided in the statute.  720 ILCS 570/405.1 (West 1994).  Defendant, when arrested, admitted her involvement in the negotiation and sale of the quarter kilo on November 7
.  She admitted that she was the supplier, that she knew Nolan and Campbell were going to sell the cocaine, and that she would receive a percentage of the money.  Therefore, we hold that defendant was proven guilty beyond a reasonable doubt. 

For the foregoing reasons, we affirm the defendants' convictions and sentences
.

Affirmed.

GREIMAN and REID, JJ., concur.